# UNPUBLISHED DECISIONS

Not Reported in F.Supp.2d, 2012 WL 3020651 (E.D.Pa.)
**(Cite as: 2012 WL 3020651 (E.D.Pa.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
Kelly DUTTON, Plaintiff,
v.
Commonwealth of, PENNSYLVANIA, et al., Defendants.

Civil Action No. 11–7285.
July 23, 2012.

Kelly Dutton, Philadelphia, PA, pro se.

Barry N. Kramer, PA Office of Atty. General, Philadelphia, PA, for Defendants.

**MEMORANDUM**

SCHILLER, District Judge.

**\*1** *Pro se* Plaintiff Kelly Dutton brings this action pursuant to 42 U.S.C. § 1983 against the Pennsylvania State Police ("PSP"), the Commonwealth of Pennsylvania, and the Pennsylvania Office of Attorney General, alleging that he was unlawfully prohibited from purchasing a firearm in February 2011. Currently before the Court is Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).FN1 For the reasons set forth below, the motion will be granted.

> FN1. Defendants also seek to dismiss the action under Federal Rule of Civil Procedure 12(b)(1) based on Eleventh Amendment immunity. Because this Court will grant Defendants' motion to dismiss for failure to state a claim, it need not analyze whether the Eleventh Amendment bars federal jurisdiction.

**I. BACKGROUND**

Dutton's claim arises from the denial of a handgun purchase in December 2010. (Compl.¶ III–C.) Under Pennsylvania law, individuals must be

screened by the Pennsylvania Instant Check System ("PICS"), an electronic background check system, before purchasing a firearm in the Commonwealth. (*Id.*) Dutton's background check revealed two convictions from 1995, one for carrying a firearm on a public street and one for carrying a firearm without a license. (*Id.;* Defs.' Mot. to Dismiss Ex. A [MC–51–CR–1211101–1994 Docket].) FN2 Both convictions are first-degree misdemeanors punishable by "a term of imprisonment, the maximum of which is not more than five years." 18 Pa. Cons.Stat. § 106(b)(6). In light of these convictions, Dutton was not permitted to purchase a firearm. (*Id.*)

> FN2. The Court takes judicial notice of the criminal docket of the Philadelphia County Court of Common Pleas, which reveals that Dutton was convicted on April 6, 1995, of carrying firearms on a public street or place and carrying firearms without a license. The docket is available at http://ujsportal.pacourts.us/DocketSheets/CPReport.ashx?docketNumber=MC–51–CR–1211101–1994.

Dutton challenged the PICS denial to the PSP's Firearms Division. (*Id.*) By letter dated February 11, 2011, the PSP stated that the denial was based upon Dutton's disqualifying convictions from 1995, pursuant to 18 U.S.C. § 922(g)(1), which prohibits a person "who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year." (*Id.;* Compl. Ex. A [Denial Letter].)

Dutton initiated this action on November 20, 2011, contending that 18 U.S.C. § 922(g) applies only to felonies and misdemeanors of domestic violence. Defendants subsequently filed a motion to dismiss presently before the Court.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3020651 (E.D.Pa.)
**(Cite as: 2012 WL 3020651 (E.D.Pa.))**

## II. STANDARD OF REVIEW

In reviewing a motion to dismiss for failure to state a claim, a district court must accept as true all well-pleaded allegations and draw all reasonable inferences in favor of the non-moving party. *See Bd. of Trs. of Bricklayers & Allied Craftsman Local 6 of N.J. Welfare Fund v. Wettlin Assocs.,* 237 F.3d 270, 272 (3d Cir.2001). A court need not, however, credit "bald assertions" or "legal conclusions" when deciding a motion to dismiss. *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

"Factual allegations [in a complaint] must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). To survive a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. Although the federal rules impose no probability requirement at the pleading stage, a plaintiff must present "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element[s]" of a cause of action. *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 234 (3d Cir.2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. Simply reciting the elements will not suffice. *Id.* (concluding that pleading that offers labels and conclusions without further factual enhancement will not survive motion to dismiss); *see also Phillips,* 515 F.3d at 231.

**\*2** The Third Circuit Court of Appeals has directed district courts to conduct a two-part analysis when faced with a 12(b)(6) motion. First, the legal elements and factual allegations of the claim should be separated, with the well-pleaded facts accepted as true but the legal conclusions disregarded. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210–11 (3d Cir.2009). Second, the court must make a commonsense determination of whether the facts alleged in the complaint are sufficient to show a plausible claim for relief. *Id . at* 211. If the court can only infer the mere possibility of misconduct, the complaint must be dismissed because it has alleged—but has failed to show—that the pleader is entitled to relief. *Id.*

## III. DISCUSSION

Dutton asks the Court to determine whether 18 U.S.C. § 922 applies to all state misdemeanors or just misdemeanors of domestic violence. (Compl.¶ III–C.) Consequently, the Court will construe Dutton as alleging a violation of his statutory rights under 18 U.S.C. § 922(g).[FN3]

FN3. While the Court will construe a *pro se* plaintiff's complaint liberally, Dutton does not allege a challenge to 18 U.S.C. § 922 under the Second Amendment. Nevertheless, had Plaintiff asserted a constitutional challenge, the Court would have found the claim lacked merit. The Third Circuit has analyzed the provision at issue in this case—18 U.S.C. § 922(g)(1)—and held it to be facially constitutional. *United States v. Barton,* 633 F.3d 168, 175 (3d Cir.2011) (citing *District of Columbia v. Heller,* 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and *McDonald v. City of Chi.,* ––– U.S. ––––, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010)). Furthermore, the Third Circuit has also found that Section 922(g)(1) is constitutional as applied to individuals who have presented no facts distinguishing their "circumstances from those of other felons who are categorically unprotected by the Second Amendment." *Id.; see also United States v. Marzzarella,* 614 F.3d 85, 92 (3d Cir.2010) (noting that "although the Second Amendment protects the individual right to possess firearms for defense of hearth and home, *Heller* suggests ... a felony conviction disqualifies an individual from asserting that interest").

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3020651 (E.D.Pa.)
**(Cite as: 2012 WL 3020651 (E.D.Pa.))**

Defendants assert that this action must be dismissed because Plaintiff has misconstrued the basis for the denial of his firearms license. (Defs.' Mem. of Law in Supp. of Commw. Defs.' Mot. to Dismiss Compl. at 8.) Dutton contends that the PSP wrongfully based the denial of his firearms license on 18 U.S.C. § 922(g)(9), which prohibits a person "convicted of a misdemeanor crime of domestic violence" from possessing a firearm. Therefore, Dutton claims, his two convictions from 1995, both first-degree misdemeanors under Pennsylvania law but not crimes of domestic violence, should not preclude him from obtaining a firearms permit. (Compl.¶ III–V.)

None of the allegations in the Complaint supports Dutton's contention that his denial was based on 18 U.S.C. § 922(g)(9). Moreover, the PSP informed Dutton that his firearms permit denial was based on 18 U.S.C. § 922(g)(1) in a letter dated February 11, 2011, which was attached to the Complaint. (Compl. Ex. A [Denial Letter].) Therefore, the Court must determine whether Dutton's previous convictions preclude him from obtaining a firearms permit under 18 U.S.C. § 922(g)(1), which prohibits a person convicted of a crime punishable by imprisonment exceeding one year from possessing a firearm.

When interpreting a statute, "our inquiry ... begins with its plain language." *Birdman v. Office of the Governor,* 677 F.3d 167, 178 (2012) (quoting *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)). Plain language "means the ordinary usage of a term." *Lawrence v. City of Phila.,* 527 F.3d 299, 317 (3d Cir.2008) (internal quotation marks omitted); *see also Okeke v. Gonzales,* 407 F.3d 585, 593 (3d Cir.2005) ("Perhaps the most fundamental principle of statutory construction is that words in a statute must be given their ordinary meaning whenever possible."). "The plain meaning of the text should be conclusive, except in the rare instance when the court determines that the plain meaning is ambiguous." *Morgan v. Gay,* 466 F.3d

276, 278 (3d Cir.2006). The relevant statute, 18 U.S.C. § 922, provides:

**\*3** It shall be unlawful for any person ... (1) *who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year* ... to ship or transport in interstate of foreign commerce, or possess in or affecting commerce, any firearm of ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1) (emphasis added). Pursuant to 18 U.S.C. § 921(a)(20), "[t]he term 'crime punishable by imprisonment for a term exceeding one year' does not include ... any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years of less." In Pennsylvania, a crime classified as a first-degree misdemeanor carries a maximum penalty of five years of incarceration. 18 Pa. Cons.Stat. § 106(b) (6); *see also Commw. v. Baldwin,* 604 Pa. 34, 37, 985 A.2d 830 (2009) (affirming a sentence of three-and-a-half to seven years imprisonment for carrying a firearm without a license, and two to four years incarceration and one year of probation for carrying a firearm on the public streets of Philadelphia). Accordingly, a Pennsylvania first-degree misdemeanor conviction does not satisfy the Section 921(a)(20) exception to Section 922(g)(1) and is grounds for denial of a firearms permit. Dutton's convictions for carrying a firearm on a public street and for carrying a firearm without a license are both considered first-degree misdemeanors under Pennsylvania law. Therefore, Dutton's convictions preclude him from qualifying for a firearms permit.

**IV. CONCLUSION**

For the reasons stated above, Dutton was lawfully denied a firearms license pursuant to 18 U.S.C. § 922(g)(1). Because Dutton has failed to state a claim against Defendants, the Court will grant the motion to dismiss. Having determined that any constitutional challenge of 18 U.S.C. 922(g)(1)

Not Reported in F.Supp.2d, 2012 WL 3020651 (E.D.Pa.)
**(Cite as: 2012 WL 3020651 (E.D.Pa.))**

would lack merit, the Court concludes that any amendment by Plaintiff would be futile and will dismiss the claim with prejudice. An Order consistent with this Memorandum will be docketed separately.

E.D.Pa.,2012.
Dutton v. Pennsylvania
Not Reported in F.Supp.2d, 2012 WL 3020651 (E.D.Pa.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

503 Fed.Appx. 125, 2012 WL 5447725 (C.A.3 (Pa.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 503 Fed.Appx. 125, 2012 WL 5447725 (C.A.3 (Pa.)))**

**H**
This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter. See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Third Circuit LAR, App. I, IOP 5.7. (Find CTA3 App. I, IOP 5.7)

United States Court of Appeals,
Third Circuit.
Kelly DUTTON, Appellant
v.
COMMONWEALTH of Pennsylvania; Office of Attorney General; State Police.

No. 12–3304.
Submitted for Possible Summary Action Pursuant to Third Circuit LAR 27.4 and I.O.P. 10.6 Oct. 18, 2012.
Opinion filed: Nov. 8, 2012.

**Background:** Plaintiff filed § 1983 action alleging that state officials violated his right to carry firearms by prohibiting him from purchasing firearm. The United States District Court for the Eastern District of Pennsylvania, Berle M. Schiller, J., 2012 WL 3020651, dismissed complaint, and plaintiff appealed.

**Holding:** The Court of Appeals held that plaintiff's prior Pennsylvania convictions for carrying firearm on public street and for carrying firearm without license disqualified him from possessing firearm.
Affirmed.

West Headnotes

**Weapons 406 ⊂⊃133**

406 Weapons
    406III Registration, Licenses, or Permits of Owners and Purchasers
    406k133 k. License to own or possess gun;

owner identification cards. Most Cited Cases
Plaintiff's prior Pennsylvania convictions for carrying firearm on public street and for carrying firearm without license disqualified him under federal law from possessing firearm, even though convictions were classified by state as first degree misdemeanors, and did not involve domestic violence, where each conviction carried maximum penalty of five years' incarceration. 18 U.S.C.A. §§ 921(a)(20), 922(g)(1); 18 Pa.C.S.A. §§ 6106(a)(2), 6108.

**\*125** On Appeal from the United States District Court for the Eastern District of Pennsylvania, (D.C. Civil No. 2:11–cv–07285), District Judge: Honorable Berle M. Schiller.Kelly Dutton, Philadelphia, PA, pro se.

Barry N. Kramer, Esq., Claudia M. Tesoro, Esq., Office of Attorney General of Pennsylvania, Philadelphia, PA, for Commonwealth of Pennsylvania; Office of Attorney General; State Police.

Before: AMBRO, SMITH and CHAGARES, Circuit Judges.

**\*126** OPINION
PER CURIAM.
**\*\*1** Kelly Dutton, proceeding pro se, appeals from an order of the United States District Court for the Eastern District of Pennsylvania granting Appellees' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) and dismissing his civil rights complaint pursuant to 42 U.S.C. § 1983 with prejudice. Because this appeal does not present a substantial question, we will summarily affirm the District Court's order. See 3d Cir. L.A.R 27.4; I.O.P. 10.6.

Because we primarily write for the parties, we need only recite the facts necessary for our discussion. In submissions to the District Court, Kelly alleges that he was prohibited from purchasing a fire-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

503 Fed.Appx. 125, 2012 WL 5447725 (C.A.3 (Pa.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 503 Fed.Appx. 125, 2012 WL 5447725 (C.A.3 (Pa.)))**

arm because his background check revealed two convictions from 1995, one for carrying a firearm on a public street and one for carrying a firearm without a license. Dutton challenged the Pennsylvania Instant Check System ("PICS") denial to the Pennsylvania State Police's ("PSP") Firearms Division. On February 11, 2011, the PSP Firearms Division advised Dutton that his denial was based upon 18 U.S.C. § 922(g)(1), which prohibits individuals convicted of a crime punishable by imprisonment for a term exceeding one year from possessing a firearm.

Dutton initiated this action against the Commonwealth of Pennsylvania, the Office of the Attorney General, and the PSP in November 2011. In his complaint, Dutton alleges that 18 U.S.C. § 922(g) applies only to felonies and misdemeanor crimes of domestic violence. On April 17, 2012, Appellees filed a motion to dismiss for lack of jurisdiction and for failure to state a claim, and Dutton filed a motion to have Appellees' motion denied on April 26, 2012. On July 23, 2012, the District Court entered an order granting Appellees' motion, denying Dutton's motion, and dismissing Dutton's complaint with prejudice. In an accompanying Memorandum, the District Court determined that Dutton was lawfully denied a firearms license and therefore failed to state a claim against Appellees. Dutton then timely filed this appeal.

We have jurisdiction pursuant to 28 U.S.C. § 1291 and exercise plenary review over the District Court's dismissal order. *See Allah v. Seiverling,* 229 F.3d 220, 223 (3d Cir.2000). To survive dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). This Court affirms a district court's dismissal for failure to state a claim "only if, accepting all factual allegations as true and constru-

ing the complaint in the light most favorable to the plaintiff, we determine that the plaintiff is not entitled to relief under any reasonable reading of the complaint." *McGovern v. City of Philadelphia,* 554 F.3d 114, 115 (3d Cir.2009). We may summarily affirm if the appeal does not present a substantial question, and may do so on any basis supported by the record. *Murray v. Bledsoe,* 650 F.3d 246, 247 (3d Cir.2011) (per curiam).

**\*\*2** To establish a claim under § 1983, a plaintiff "must establish that [he was] deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). Here, Dutton appears to allege a violation **\*127** pursuant to 18 U.S.C. § 922(g).[FN1] As an initial matter, the District Court properly determined that nothing in Dutton's complaints supports his contention that the denial of his firearms license was based upon 18 U.S.C. § 922(g)(9), which prohibits individuals "convicted of a misdemeanor crime of domestic violence" from possessing a firearm. His convictions do not stem from crimes of domestic violence, and the PSP's Firearms Division specifically informed him that the denial was based upon 18 U.S.C. § 922(g)(1).

> FN1. We must construe Dutton's complaint liberally, *see Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (noting that courts must hold pro se complaints to "less stringent standards than formal pleadings drafted by lawyers"). However, Dutton does not seem to allege either that Appellees violated his Second Amendment rights or that 18 U.S.C. § 922(g)(1) violates the Second Amendment. Nevertheless, such a challenge would necessarily fail. Four years ago, the Supreme Court determined that the Second Amendment confers an individual right to keep and bear arms for self-defense. *District of*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

503 Fed.Appx. 125, 2012 WL 5447725 (C.A.3 (Pa.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 503 Fed.Appx. 125, 2012 WL 5447725 (C.A.3 (Pa.)))**

*Columbia v. Heller,* 554 U.S. 570, 595, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). However, the Court explicitly noted that this determination did not cast "doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 626, 128 S.Ct. 2783; *see also McDonald v. City of Chicago,* ——U.S. ——, 130 S.Ct. 3020, 3047, 177 L.Ed.2d 894 (2010) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.' "). As discussed below, Dutton's previous convictions classify him as a felon under 18 U.S.C. § 922(g)(1), and this Court has previously determined that 18 U.S.C. § 922(g)(1) is facially constitutional. *United States v. Barton,* 633 F.3d 168, 175 (3d Cir.2011). Furthermore, the *Barton* court determined that § 922(g)(1) is constitutional as applied to an individual, like Dutton, who has "presented no facts distinguishing his circumstances from those of other felons who are categorically unprotected by the Second Amendment." *Id.*

Section § 922(g)(1) prohibits individuals who have been convicted of "a crime punishable by imprisonment for a term exceeding one year" from possessing a firearm. However, this term specifically does not include "any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less." 18 U.S.C. § 921(a)(20)(B). While both of Dutton's previous convictions are classified as first degree misdemeanors in Pennsylvania, *see* 18 Pa. Cons.Stat § 6106(a)(2) (carrying a firearm without a license); *Commonwealth v. Foster,* 609 Pa. 502, 17 A.3d 332, 342 n. 16 (2011) (noting that a conviction under 18 Pa. Cons.Stat. § 6108 is a first degree misdemeanor), first degree misdemeanors carry a maximum penalty of five years' incarceration, 18 Pa. Cons.Stat. § 106(b)(6). Accordingly, a conviction for a first degree misdemeanor in

Pennsylvania does not satisfy the exception created in 18 U.S.C. § 921(a)(20), and the District Court properly granted Appellees' motion to dismiss Dutton's complaint for failure to state a claim.[FN2]

> FN2. The District Court did not provide Dutton leave to amend his complaint because "any amendment ... would be futile." (*Dutton v. Pennsylvania,* E.D. Pa. Civ. No. 2:11–cv–07285, Docket # 7 at 6.); *see Grayson v. Mayview State Hosp.,* 293 F.3d 103, 114 (3d Cir.2002) (noting that courts should not dismiss pro se complaints without granting leave to amend unless "amendment would be inequitable or futile"). We conclude that the District Court did not err in declining to allow Dutton an opportunity to amend because we do not see how any amendment to Dutton's complaint would save his claim.

For the foregoing reasons, no substantial question is presented and we will affirm the judgment of the District Court. *See* 3d Cir. L.A.R 27.4; I.O.P. 10.6.

C.A.3 (Pa.),2012.
Dutton v. Com.
503 Fed.Appx. 125, 2012 WL 5447725 (C.A.3 (Pa.))

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

Not Reported in F.Supp.2d, 2004 WL 1047719 (E.D.Pa.)
**(Cite as: 2004 WL 1047719 (E.D.Pa.))**

C

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
Jerome LINDEN
v.
SAP AMERICA, INC.

No. Civ.A. 03–3125.
May 6, 2004.

Robert M. Firkser, Del Sordo & Firkser, Media,
PA, for Plaintiff.

Jo Bennett, Stevens & Lee, Philadelphia, PA, William J. Payne, Stevens & Lee PC, King Of Prussia,
PA, for Defendant.

*MEMORANDUM AND ORDER*
HUTTON, J.

**\*1** Presently before the Court are Defendant's
Motion for Summary Judgment (Docket No. 6),
Plaintiff's response (Docket No. 9), Defendant's
reply (Docket No. 10), Plaintiff's sur-response
(Docket No. 17), and Plaintiff's Supplemental sur-reply brief thereto (Docket No. 18).

I. *BACKGROUND* [FN1]

> FN1. To the extent the facts are in dispute,
> they are presented in the light most favor-able to the plaintiff.

This suit arises out of Plaintiff's termination
from employment with Defendant. On December
29, 1997, Plaintiff Jerome Linden ("Linden") was
hired by Defendant SAP America, Inc. ("SAP").
Linden alleges that he accepted employment at SAP
in reliance upon the terms and conditions set forth
in a letter dated November 24, 1997, offering him
employment ("Offer Letter").

Linden began his career at SAP as Business
Development Director in the firm's Public Sector
division. His title was changed to Director of Strategic Initiatives in early 2000. Linden then joined
the Solutions Management Organization group
("SMO") as Director of Business Planning in late
2000 or early 2001. In the fall of 2001, the SMO
group was dissolved just as SAP underwent a work
force reduction of several hundred employees.
Linden was not laid off and joined the Sales Effectiveness and Business Transformation Group at the
end of 2001.

On September 27, 2002, Linden met with Edwin Lange ("Lange"), Executive Vice President of
Sales, to discuss the possibility of returning to the
Public Sector group. At the meeting, Linden
learned that his position was being eliminated and
that he would be terminated. A week later, Linden
met with Jewell Parkinson ("Parkinson"), an SAP
Human Resources representative, to discuss the
terms of his separation from SAP. Parkinson stated
that Linden was eligible for separation pay under
the SAP Separation Plan ("Separation Plan" or
"Plan") but that he was not eligible for any bonus
for 2002. In a letter dated October 22, 2002, SAP
confirmed the terms of Linden's separation and
provided him with a copy of the Separation Plan.

A. *Separation Plan*

Based on the Separation Plan Guidelines, SAP
offered Linden separation pay of approximately
$31,000 in a lump-sum, healthcare for an additional
three months, and access to outplacement employment services. In order to receive the Plan benefits,
Linden was required to (1) work until the last day
designated, (2) execute a Release and Waiver of
Claims ("Release"), and (3) return employer property. The Plan does not mention the payment of any
bonuses. Linden did not execute the Release.

B. *Bonus Payments*

For the years 1998 through 2001, Linden received compensation in the form of a base salary
and a bonus. Linden did not receive a bonus for

Not Reported in F.Supp.2d, 2004 WL 1047719 (E.D.Pa.)
**(Cite as: 2004 WL 1047719 (E.D.Pa.))**

2002 and alleges that he is entitled to a bonus for that year. The bonus payments were determined from a combination of factors including employee performance, SAP's performance, and customer satisfaction. Linden received an individual bonus schedule outlining some of the criteria for a bonus for the years 1998 through 2001. The schedule also stated that if an employee is terminated before the bonus pay-out date, he forfeits the bonus. Linden and other employees in his group did not receive a bonus schedule for 2002.

C. *Procedural History*

**\*2** On April 17, 2003, Linden initiated this lawsuit in the Court of Common Pleas of Delaware County, Pennsylvania, seeking both a bonus for the year 2002 and severance benefits under the Plan. Counts I through III seek a bonus payment for the year 2002. In Count I Linden asserts a breach of contract claim against SAP for its failure to pay him a bonus for the year 2002. In Count II Linden argues that he detrimentally relied on SAP's promise that he would receive a bonus for the year 2002. In Count III Linden asserts a violation of the Pennsylvania Wage Payment and Collection Law. Lastly, in Count IV, Linden asserts a breach of contract claim for his severance benefits. SAP removed the case to this Court on May 16, 2003 on the basis that Count IV of Linden's claim is governed by the Employee Retirement Income Security Act of 1974. SAP now moves for summary judgment as to all counts.

## II. *LEGAL STANDARD*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of showing the basis for its motion. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant adequately supports its motion pursuant to

Rule 56(c), the burden shifts to the nonmoving party to go beyond the mere pleadings and present evidence through affidavits, depositions, or admissions on file showing a genuine issue of material fact for trial. *See id.* at 324. The substantive law determines which facts are material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then there is a genuine issue of material fact. *See id.*

When deciding a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993). Moreover, a court may not consider the credibility or weight of the evidence in deciding a motion for summary judgment, even if the quantity of the moving party's evidence far outweighs that of its opponent. *See id.* Nonetheless, a party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. *See Trap Rock Indus., Inc. v. Local 825,* 982 F.2d 884, 890 (3d Cir.1992).

## III. *DISCUSSION*

Because the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.,* is the sole basis for federal subject matter jurisdiction in this case, the Court must first decide whether the SAP Separation Plan is an employee benefit plan governed by ERISA.

A. *Existence of an ERISA Plan*

**\*3** ERISA provides for the uniform federal regulation of employee benefit plans. *See Keystone Chapter, Associated Builders and Contractors, Inc. v. Foley,* 37 F.3d 945, 954 (3d Cir.1994). Section 514(a), ERISA's preemption provision, states that "the provisions of [ERISA] shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). The words "relate to" have been construed

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1047719 (E.D.Pa.)
**(Cite as: 2004 WL 1047719 (E.D.Pa.))**

very expansively. A law "relates to" an employee benefit plan "if it has a connection with or reference to such a plan." *Egelhoff v.. Egelhoff,* 532 U.S. 141, 147, 121 S.Ct. 1322, 149 L.Ed.2d 264 (2001). State law breach of contract claims are preempted by ERISA. *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 43, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *LaFata v. Raytheon Co.,* 223 F.Supp.2d 668, 676 (E.D.Pa.2002).

ERISA defines an employee welfare benefit plan as:

[A]ny plan, fund, or program ... established or maintained by an employer ... for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability death or unemployment....

29 U.S.C. § 1002(1)(A). This definition includes plans that provide employees with severance benefits upon the termination of employment. *See* 29 U.S.C. § 1002(1); *Massachusetts v. Morash,* 490 U.S. 108, 116 (1989). Specifically, severance benefits implicate ERISA if they require the establishment of an ongoing and separate administrative scheme to provide benefits. *See Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 11–12, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987); *Fetterolf v. Harcourt General, Inc.,* No. 01–1112, 2001 WL 1622196, at *2 (E.D.Pa. Dec.18, 2001).

In this case, the SAP Separation Plan contains a "set of standard procedures to guide [the] processing of claims and disbursement of benefits." *Fort Halifax,* 482 U.S. at 9. The Plan enumerates a formula for the calculation of benefits, with discretion reserved to SAP to either increase or decrease the separation pay and to decide the employee's level of access to outplacement services. The Plan also carefully describes the conditions under which employees are eligible for severance benefits, provides three different possible arrangements for the distribution of such benefits, and contains a de-

tailed claims procedure. Lastly, the Plan document itself states that it "comprises the official text of the Plan and the summary plan description" under ERISA and includes a statement of ERISA rights. *See* SAP Separation Plan, at 1, 11–12 (Docket No. 6, Ex. D); *Gursky v. General Elec. Gov't Serv.,* No. 90–3016, 1990 WL 98996 (E.D.Pa. July 13, 1990) (employer's layoff benefits plan was ERISA plan because it required administrative guidance and plan stated that it was subject to ERISA); *see also Pane v. RCA Corp.,* 868 F.2d 631 (3d Cir.1989) (plan awarding severance payments to select executives was ERISA plan because it required administrative scheme); *Middleton v. Phila. Elec. Co.,* 850 F.Supp. 348, 351 (E.D.Pa.1994) (stating that whether severance payments qualified as ERISA plan hinged on the amount of employer discretion in providing payment). Accordingly, the Court concludes that the SAP Plan is an ERISA plan and consequently, Linden's state law claim for severance benefits is preempted.[FN2]

> FN2. Linden also concedes that, to the extent the Plan is an ERISA plan, his state law claims for severance benefits are preempted and should be construed as a claim under ERISA. *See* Pl.'s Mem. of Law, at 16 (Docket No. 9).

**B. Count IV: Severance Benefits**

**\*4** The Court now construes Count IV as a claim for severance benefits pursuant to § 502(a)(1)(B) of ERISA, codified at 29 U.S.C. § 1132(a)(1)(B).[FN3] Specifically, Linden asserts that SAP may not require him to sign a release waiving his claim to the year 2002 bonus in return for severance pay.[FN4] Put differently, Linden asserts that he is entitled to severance pay under the Plan even without signing the Release. Linden's claim thus hinges on (1) whether ERISA permits the requirement of a release in exchange for severance benefits and (2) whether the language of the Plan is clear and unambiguous in stating its requirements.

> FN3. Section 502(a)(1)(B) states in relev-

Not Reported in F.Supp.2d, 2004 WL 1047719 (E.D.Pa.)
**(Cite as: 2004 WL 1047719 (E.D.Pa.))**

ant part:

> A civil action may be brought by a parti-
> cipant or beneficiary to recover benefits
> due to him under the terms of his plan, to
> enforce his rights under the terms of the
> plan, or to clarify his rights to future be-
> nefits under the terms of the plan.

> 29 U.S.C. § 1132(a)(1)(B).

FN4. The Release states in relevant part:

> In consideration for the benefits outlined
> in the attached letter dated October 22,
> 2002, from Phyllis Landstrom, I, Jerome
> Linden hereby remise, release, and
> forever discharge SAP America Inc ....
> of and from any all manner of actions
> and causes of actions ... and particularly
> ... any claims concerning or relating in
> any way to my employment relationship
> or the termination of my employment re-
> lationship with [SAP], including but not
> limited to, any claims which have been
> asserted, could have been asserted, or
> could be asserted now or in the future ...
> including any claims arising under any
> of the statutes listed on Exhibit A of this
> Release, and any and all other federal,
> state, or local laws, and any common law
> claims now or hereafter recognized, as
> well as all claims for counsel fees and
> costs.

> Def.'s Mem. of Law, Ex. E (Docket No.
> 6).

First, ERISA does not require employers to provide severance benefits or any other substantive entitlement to employer-provided welfare benefits. *See Inter–Modal Rail Employees Ass'n v. Atchinson, Topeka and Santa Fe Ry. Co.,* 520 U.S. 510, 515, 117 S.Ct. 1513, 137 L.Ed.2d 763 (1997) ("ERISA itself does not regulate the substantive content of welfare-benefit plans."); *Curtiss–Wright*

*Corp. v. Schoonejongen,* 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995). "Employers ... are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Id.; see also Panaras v. Liquid Carbonic Indus. Corp.,* 74 F.3d 786, 789 (7th Cir.1996). Under ERISA, a waiver or release of claims is permissible. *See Lockheed Corp. v. Spink,* 517 U.S. 882, 894–95, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996); *Lawson v. Consolidated Rail Corp.,* No. 97–7206, 1999 U.S. Dist. LEXIS 3674, at *9 (E.D.Pa. Mar. 29, 1999). "Claims under the ADEA, Title VII, ERISA, and state common law may be waived by the employee signing a release." *Bennett v. Independence Blue Cross,* No. 92–4249, 1993 WL 15603, at *2 (E.D.Pa. Jan.13, 1993) (citations omitted). The Third Circuit stated, in an unpublished opinion, "It is not impermissible to condition the payment of severance upon a release of all claims." *McVeigh v. Philadelphia Nat'l Bank,* 993 F.2d 224, 16 Employee Benefits Cas. (BNA) 2166, 2168 (3d Cir.1993).FN5 Here, SAP designed a separation plan that offered severance pay, health care, and outplacement services. In exchange for these benefits, SAP required among other things the execution of a release of claims. The Court thus concludes that the Release is permissible under ERISA.

> FN5. Although unpublished opinions lack
> precedential value, citation to unpublished
> opinions is not prohibited under the Third
> Circuit Local Appellate Rules, and there-
> fore, such opinions may serve as persuas-
> ive authority in this Circuit. *See* L.A.R.
> 28.3(a) (3d Cir.2003); *see also City of Ne-
> wark v. Dep't of Labor,* 2 F.3d 31, 33 n. 3
> (3d Cir.1993).

Next, a claim for benefits under § 502(a)(1)(B) is an assertion of a contractual right under the terms of the plan. *See Burstein v. Ret. Account Plan for Employees of Allegheny Health Educ. & Research Found.,* 334 F.3d 365, 381 (3d Cir.2003). The written terms of the plan documents are controlling. *See In re Unisys Corp. Retiree Med. Benefit "ERISA"*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1047719 (E.D.Pa.)
**(Cite as: 2004 WL 1047719 (E.D.Pa.))**

*Litig.,* 58 F.3d 896, 902 (3d Cir.1995). When considering claims under § 502(a)(1)(B), the plan is interpreted under principles of contract law. *See Kemmerer v. ICI Ams.,* 70 F.3d 281, 288 (3d Cir.1995). Those principles require that a court first look to the plain language of the document. If that language is clear, courts must not look to other evidence. *See Bill Gray Enters. v. Gourley,* 248 F.3d 206, 218 (3d Cir.2001). In this case, the language of the Separation Plan is clear and unambiguous. The Plan states that an employee is eligible for benefits if he is "being terminated involuntarily by [SAP] in connection with a job elimination, ... reduction in force, business restructuring, ... or such other circumstances." SAP America Separation Plan and Summary Plan Description, at 3 (Docket No. 6, Ex. D). The Plan also states that the eligible employee must satisfy three conditions before receiving the separation benefits: (1) work until the last day designated; (2) execute all separation documents, including a release; and (3) return all employer property and settle all expenses owed. *See id.* at 5. It is undisputed that Linden is an employee eligible under the Plan and that he did not execute the Release.

**\*5** Further, the language of the Release is straightforward, clear, and unambiguous. It identified the consideration and specifically informs the employee that by signing, he releases the employer from "any and all actions and causes of actions ... that are legally waivable ... including any claims arising under any of the statues listed ... and any and all other federal, state, or local laws, and any common law claims." The Release explicitly advised Linden to consult with an attorney prior to signing the Release and gave Linden forty-five days to consider its terms. Importantly, it is undisputed that Linden sought the advice of counsel before deciding that he would not sign the Release.

In sum, the Court concludes that the plain language of the Plan clearly states the three steps an eligible employee must take in order to receive Plan benefits and that the requirement of a release as a condition of receiving severance benefits under the Plan is permissible under ERISA. Moreover, after careful thought, Linden declined to execute the release. Under these circumstances, SAP is not obligated to pay Linden any severance benefits.

In the alternative, Linden argues that SAP's refusal to pay the severance benefits is a violation of ERISA § 510, codified at 29 U.S .C. § 1140. Section 510 states in pertinent part:

> It shall be unlawful for any person to ... discriminate against a participant ... for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitle under the plan....

29 U.S.C. § 1140. Congress enacted § 510 "primarily to prevent unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension benefits." *Eichorn v. AT & T Corp.,* 248 F.3d 131, 149 (3d Cir.2001). An employer violates § 510 when it acts with the specific intent to interfere with an employee's right to benefits. *See id.* (citing *DiFederico v. Rolm Co.,* 201 F.3d 200, 204–05 (3d Cir.2000)). To prove a prima facie case under § 510, a plaintiff must show that the employer took specific actions for the purpose of interfering with the employee's attainment of pension eligibility or additional benefits. *See DiFederico,* 201 F.3d at 204; *Schwartz v. Independence Blue Cross,* 299 F.Supp.2d 441, 446 (E.D.Pa.2003). Once a plaintiff makes such a prima facie showing, the employer has the burden of articulating a legitimate, non-discriminatory reason for his conduct. The burden then shifts back to the plaintiff to show that the employer's rationale was pretextual and that the cancellation of benefits was the determinative influence on the employer's actions. *DiFederico,* 201 F.3d at 205. Here, Linden has not shown that SAP acted with a motive prohibited by § 510. Linden has not proffered any evidence that SAP specifically intended to violate ERISA nor that SAP acted with the specific inten-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1047719 (E.D.Pa.)
**(Cite as: 2004 WL 1047719 (E.D.Pa.))**

tion of denying Linden his severance benefits. Moreover, it would be illogical for SAP to decide to terminate Linden and offer him a severance package if it had no intention of paying those benefits.

**\*6** Accordingly, because Linden is not entitled to benefits under § 510 nor under § 502(a)(1)(B) without signing the Release, summary judgment is entered in favor of SAP as to Count IV.

C. *State Law Claims for Bonus*

Linden's remaining claims are state law claims related to the payment of a bonus for the year 2002.

1. *Count I: Breach of Contract*

Linden asserts that the 1997 Offer Letter constituted a contract between SAP and himself, entitling him to a bonus every year as long as he met his performance goals, and that SAP's failure to pay him a bonus for the year 2002 constitutes a breach of that contract. In response, SAP argues that the Letter did not obligate it to pay Linden a bonus for 2002.[FN6]

> **FN6.** In Pennsylvania, all employment is presumed to be at-will. *See Permenter v. Crown Cork & Seal Co., Inc.,* 38 F.Supp.2d 372, 377 (E.D.Pa.1999). Nevertheless, the Court notes that every employment relationship is contractual in nature. *See Kofsky v. Chemical Residential Mortgage Corp.,* No. 98–0323, 1999 WL 1016976, at \*3 (E.D.Pa. Oct.28, 1999). Linden does not challenge his status as an employee-at-will. Further, the instant matter does not concern Linden's at-will status but rather the bonuses allegedly due to Linden under his alleged employment contract.

Under Pennsylvania law, to make out a cause of action for breach of contract, the plaintiff must plead and prove (1) the existence of a contract, including its essential terms, (2) a breach of the duty imposed by the contract, and (3) that damages res-

ulted from the breach. *See Halstead v. Motorcycle Safety Found. Inc.,* 71 F.Supp.2d 455, 458 (E.D.Pa.1999); *Corestates Bank v. Cutillo,* 723 A.2d 1053, 1058 (Pa.Super.1999). The Court must determine, as a matter of law, whether the relevant contract terms are ambiguous. *See 12th St. Gym v. Gen. Star. Indem. Co.,* 93 F.3d 1158, 1165 (3d Cir.1996). If the contract is unambiguous, then it is for the Court to decide whether the contract was breached. *See St. Paul Fire & Marine Ins. Co. v. Lewis,* 935 F.2d 1428, 1431 (3d Cir.1991); *Mellon Bank, N.A. v. Aetna Bus. Credit,* 619 F.2d 1001, 1011 n. 10 (3d Cir.1980); *Engers v. Perini Corp.,* No. 92–1982, 1993 WL 235911, at \*3 (E.D.Pa. June 28, 1993). On the other hand, if an ambiguity is found, then it is for the trier of fact to determine the meaning of the contractual terms by considering both the plain language and extrinsic evidence. *Mellon Bank,* 619 F.2d at 1011 & n. 10.

Here, the parties do not dispute that the 1997 Offer Letter constitutes a contract. However, the parties dispute the meaning of the provision regarding Linden's base bonus. The relevant provision of the Offer Letter states:

> This offer is made to you at an annual base salary of $150,000. In addition, your targeted base bonus will be 40% of the annual base salary with additional accelerators to be determined.

Def.'s Mot. for Summ. J., Ex. B (Docket No. 6). Linden construes this to mean that, assuming he meets his performance criteria, he is always entitled to the base salary plus a minimum of a 40% bonus. SAP responds that the language of the Letter does not guarantee Linden a bonus for the year 2002. In SAP's view, the provision in the Offer Letter does not constitute a definite offer that Linden would receive a bonus at any time, let alone for the year 2002. Because "[t]he task of construing ambiguous contract terms is one for the fact finder," *Fetterolf,* 2001 WL 1622196, at \*4 (citing *Murphy v. Duquesne Univ. of the Holy Ghost,* 565 Pa. 571, 777 A.2d 418, 429–30 (Pa.2001)), SAP's motion for summary judgment as to this count is denied.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1047719 (E.D.Pa.)
**(Cite as: 2004 WL 1047719 (E.D.Pa.))**

2. *Count II: Detrimental Reliance/Promissory Estoppel*

**\*7** Alternatively, Linden asserts a claim for the bonus under a theory of detrimental reliance, or promissory estoppel. Linden claims that, based on SAP's representations in the Offer Letter as well as SAP's conduct of paying him bonuses annually from 1998 to 2001, he was led to believe that he would receive a bonus in 2002.

"Promissory estoppel is an equitable remedy to be implemented only when there is no contract." *Bosum Rho v. Vanguard Ob/Gyn Assocs., P.C.,* No. 98–1673, 1999 WL 228993, at *6 (E.D.Pa. Apr.15, 1999) (quoting *Iverson Baking Co. v. Weston Foods, Ltd.,* 874 F.Supp. 96, 102 (E.D.Pa.1995)). Courts have held that breach of contract and promissory estoppel claims may be pleaded in the alternative, but that if the court finds that a contract exists, the promissory estoppel claim must fail. *See Carlson v. Arnot–Ogden Mem'l Hops.,* 918 F.2d 411, 416 (3d Cir.1990). Because promissory estoppel is a quasi-contract equitable remedy, it is "invoked in situations where the formal requirements of contract formation have not been satisfied and where justice would be served by enforcing a promise." *Id.*

In this case, a contract exists between Linden and SAP. The 1997 Offer Letter describes the terms of Linden's employment with SAP. Accordingly, Linden's claim for a bonus under a theory of promissory estoppel is precluded by his breach of contract action and summary judgment is granted in favor of SAP as to Count II.

3. *Count III: Pennsylvania Wage Payment and Collection Law*

In Count III Linden asserts a claim under the Pennsylvania Wage Payment and Collection Law, 43 Pa. Cons.Stat. Ann. § 260.1 *et seq.,* ("WPCL").

The WPCL states, in pertinent part, "Every employer shall pay all wages, other than fringe benefits and wage supplements, due to his employees on regular paydays designated in advance by the em-

ployer." 43 Pa. Cons.Stat. Ann. § 260.3(a). "Wages," by definition, include "all earnings of an employee, regardless of whether determined on time, task, piece, commission, or other method of calculation." *Id.* at § 260.2(a). The WPCL "does not create an employee's substantive right to compensation; rather it only establishes an employee's right to enforcement payment of wages and compensation to which an employee is otherwise entitled by the terms of an agreement." *Miccoli v. Ray Communications, Inc.,* No. 99–3825, 2000 WL 1006937, at *4 (E.D.Pa. July 20, 2000) (quoting *Hartman v. Baker,* 766 A.2d 347, 352 (Pa.Super.2000)); *see DeAsencio v. Tyson Foods, Inc.,* 342 F.3d 301, 309 (3d Cir.2003). "The contract between the parties governs in determining whether specific wages are earned." *DeAsencio,* 342 F.3d at 309. Moreover, "[b]onuses owed under an employment contract are 'wages' within the meaning" of the WPCL. *Gautney v. Amerigas Propane, Inc.,* 107 F.Supp.2d 634, 646 (E.D.Pa.2000).

Linden argues that the 1997 Offer Letter imposes a contractual obligation for SAP to pay him a bonus for the year 2002. SAP denies that the Letter creates such an obligation. Because genuine issues of material fact exist regarding the bonus provision in the Offer Letter, SAP's motion for summary judgment as to Count III is denied.

IV. *CONCLUSION*

**\*8** For the reasons stated, summary judgment is entered in favor of Defendant SAP as to Counts II and IV. SAP's summary judgment motion is denied as to Counts I and III.

An appropriate Order follows.

*ORDER*
AND NOW, this 6th day of May, 2004, upon consideration of Defendant SAP America, Inc.'s Motion for Summary Judgment (Docket No. 6), Plaintiff Jerome Linden's response (Docket No. 9), Defendant's reply (Docket No. 10), Plaintiff's surresponse (Docket No. 17), and Plaintiff's Supplemental sur-reply brief thereto (Docket No. 18), and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1047719 (E.D.Pa.)
**(Cite as: 2004 WL 1047719 (E.D.Pa.))**

for the reasons set forth in the accompanying Memorandum, IT IS HEREBY ORDERED that Defendant's Motion is GRANTED in part and DENIED in part as follows:

(1) Defendant's Motion for Summary Judgment is GRANTED as to Counts II and IV; and

(2) Defendant's Motion for Summary Judgment is DENIED as to Counts I and III.

E.D.Pa.,2004.

Linden v. Sap America, Inc.

Not Reported in F.Supp.2d, 2004 WL 1047719 (E.D.Pa.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 145195 (S.D.W.Va.)
**(Cite as: 2011 WL 145195 (S.D.W.Va.))**

**H**

Only the Westlaw citation is currently available.

United States District Court, S.D. West Virginia.
UNITED STATES of America, Plaintiff,
v.
Billy E. LUNSFORD, Defendant.

Criminal Action No. 2:10–cr–00182.
Jan. 18, 2011.

William B. King, II, U.S. Attorney's Office, Charleston, WV, for Plaintiff.

**MEMORANDUM OPINION AND ORDER**

THOMAS E. JOHNSTON, District Judge.

*1 Pending before the Court is Defendant Billy E. Lunsford's Motion to Dismiss [Docket 20]. For the reasons set forth below, the motion is **DENIED.** FN1

> FN1. As noted at the pretrial motions hearing, Defendant's unopposed Motion to Strike Surplasage [Docket 22] is **GRANTED.**

*I. BACKGROUND*

On October 22, 2010, the grand jury returned a one-count indictment against Defendant, Billy E. Lunsford, charging him with possessing a firearm after he had been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2). (Docket 2 at 1–2.) The indictment alleges that Defendant knowingly possessed a .22 caliber Firestorm pistol in and affecting interstate commerce on or about September 7, 2010.

To be charged with violating § 922(g)(1), Defendant must have a predicate felony conviction. The government relies upon Defendant's March 30, 2006, FN2 felony conviction in the Circuit Court of Logan County, West Virginia, of delivery of a Schedule II controlled substance, hydrocodone, in

violation of W.Va.Code. § 60A–4–401(a). FN3

> FN2. Although this is the date referenced in the indictment, the Court notes that there is some confusion on the exact date of this conviction. The Circuit Court of Logan County reports that Defendant pled guilty to this offense on September 1, 2005, and was sentenced on February 6, 2006.

> FN3. The Court notes that Defendant has two other felony convictions, for grand theft of a motor vehicle and uttering. Defendant contends that these convictions did not involve violence or the use of a firearm. For the purposes of analyzing this motion, the Court restricts its discussion to the predicate felony contained in the indictment.

The instant indictment originates from a "knock and talk" conducted by police officers at the home of one Susan Thomas, located in Logan County, West Virginia. On September 7, 2010, members of the U.S. Route 119 Drug Task Force (Task Force) conducted a controlled buy at Ms. Thomas' residence. Defendant was not involved in that sale. Later that day, officers returned to the home and, with the permission of Ms. Thomas, proceeded to search the premises. All present occupants of the home, which included Defendant, were then directed to stand on the front porch and empty their pockets. At that time, Defendant advised an officer working with the Task Force that he had a gun in his pocket, which he then placed on the railing.

Defendant was later charged with violating 18 U.S.C. § 922(g)(1), which provides, in pertinent part, "It shall be unlawful for any person who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year ... to ... possess in or affecting interstate commerce ...

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 145195 (S.D.W.Va.)
**(Cite as: 2011 WL 145195 (S.D.W.Va.))**

any firearm or ammunition." In the current motion, Defendant contends that 18 U.S .C. § 922(g)(1), as applied to him, violates his Second Amendment right to self-defense.

### II. APPLICABLE LAW

Pursuant to Fed.R.Crim.P. 12(b)(3)(B), the district court may, at any time during the pendency of a case, hear a defendant's claim that an indictment fails to state an offense or is otherwise defective. *See In re Civil Rights Cases,* 109 U.S. 3, 8–9 (1883). An indictment is defective if it charges a violation of an unconstitutional statute. *See United States v. Thomas,* 367 F.3d 194, 197 (4th Cir.2004). Upon a finding that an indictment is defective, the district court must dismiss the indictment.

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. The Supreme Court in *District of Columbia v. Heller,* 554 U.S. 570 (2008), recently held that the Second Amendment secures an individual right to keep and bear arms. *Id.* at 595. Interpreting the text in light of how it would have been viewed by "ordinary citizens in the founding generation," *id.* at 577, the Court held that the "core" of the Second Amendment's protections was "the right of law-abiding, responsible citizens to use arms in the defense of hearth and home." *Id.* at 634.

**\*2** The Second Amendment right as identified in *Heller* is "limited in scope and subject to some regulation." *United States v. Chester,* ——F.3d ——, No. 09–4084, 2010 WL 5396069, at *2 (4th Cir. Dec. 30, 2010). Notably, the *Heller* Court identified a non-exhaustive, illustrative list of "longstanding prohibitions on the possession of firearms" as "presumptively lawful regulatory measures." *Heller,* 544 U.S. at 626–27 & n. 26. Among the longstanding prohibitions that the Court found presumptively lawful were those on the possession of firearms by felons. *Id.* at 626. As such, § 922(g)(1) falls squarely within the list of presumptively lawful measures announced in *Heller.*

Although not determining precisely where these "presumptively lawful regulatory measures" fit, the Fourth Circuit recently outlined a two-part approach to post-*Heller* Second Amendment claims. *Chester,* 2010 WL 5396069, at *6. First, the court must conduct a historical inquiry into the challenged law, asking whether it " 'imposes a burden on conduct falling within the scope of the Second Amendment's guarantee' ... at the time of ratification." *Id.* (quoting *United States v. Marzzarella,* 614 F.3d 85, 89 (3d Cir.2010)). If it does not, the law is valid and the court's inquiry ends. *Id.* Second, if the challenged law does burden "conduct within the Second Amendment as historically understood," then the court should apply "an appropriate form of means-ends scrutiny." *Id.* Unless the first part of the test establishes that the conduct at issue is outside of the scope of the Second Amendment, "the Government bears the burden of justifying the constitutional validity of the law." *Id.*

Noting that *Heller* left open the appropriate level of scrutiny for laws burdening protected Second Amendment conduct, the Fourth Circuit in *Chester* advocated importing concepts from First Amendment jurisprudence. *See id.* at *8 ("[W]e agree with those who advocate looking to the First Amendment as a guide in developing a standard of review for the Second Amendment."). Noting that the level of scrutiny applied in First Amendment cases varies dependent on the nature of both the regulated conduct and the burden on protected activity imposed by the regulation itself, *Chester* embraced language from a vacated Seventh Circuit panel opinion:

The Second Amendment is no more susceptible to a one-size-fits-all standard of review than any other constitutional right. Gun-control regulations impose varying degrees of burden on Second Amendment rights, and individual assertions of the right will come in many forms. A severe burden on the core Second Amendment right of armed self-defense should require strong justific-

Not Reported in F.Supp.2d, 2011 WL 145195 (S.D.W.Va.)
**(Cite as: 2011 WL 145195 (S.D.W.Va.))**

ation. But less severe burdens on the right, laws that merely regulate rather than restrict, and laws that do not implicate the central self-defense concern of the Second Amendment, may be more easily justified.

**\*3** *Id.* (quoting *United States v. Skoien,* 587 F.3d 803 (7th Cir.2009), *vacated,* 614 F.3d 638 (7th Cir.2010) (en banc)). The Fourth Circuit went on to hold that a claim falling outside of the "core right identified in *Heller,*" defined as "the right of every *law-abiding, responsible* citizen to possess and carry a weapon for self defense," merited intermediate scrutiny. *Id.* (emphasis in original).

### III. DISCUSSION

This Court is acutely aware of the Supreme Court's twice-repeated admonition to lower courts that its decision in *Heller* should not be interpreted to "cast doubt on longstanding prohibitions" such as "the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller,* 544 U.S. 626–27; *McDonald v. City of Chicago,* ––– U.S. ––––, 130 S.Ct. 3020, 3047 (2010). These "presumptively lawful regulatory measures," including 18 U.S.C. § 922(g)(1), were *specifically identified* by the Supreme Court as surviving the sea change in the law brought by *Heller* and *McDonald. Heller,* 544 U.S. at 626–27 & n. 26; *McDonald,* 130 S.Ct. at 3047. Courts around the country, including the Fourth Circuit, have almost uniformly used the Court's "presumptively lawful" language, standing alone, to dismiss the post-*Heller* wave of facial challenges to the constitutionality of § 922(g)(1). *See, e.g., United States v. Brunson,* No. 07–4962, 292 F. App'x 259, 261 (4th Cir. Sept. 11, 2008) (per curiam) (dismissing a Second Amendment challenge to § 922(g)(1) as "meritless" in light of the language in *Heller* ); *see also United States v. Rozier,* 598 F.3d 768, 771 (11th Cir.2010) (per curiam); *United States v. Vongxay,* 594 F.3d 1111, 1114 (9th Cir.2010); *United States v. Khami,*

362 F. App'x 501, 507–08 (6th Cir.2010); *United States v. McCane,* 573 F.3d 1037, 1047 (10th Cir.2009); *United States v. Stuckey,* 317 F.App'x 48, 50 (2d Cir.2009) (per curiam); *United States v. Anderson,* 559 F.3d 348, 552 & n. 6 (5th Cir.2009); *United States v. Irish,* 285 F. App'x 326, 327 (8th Cir.2008) (per curiam).

*A. 18 U.S.C. § 922(g)(1) is constitutional on its face.*

The Fourth Circuit's recent decision in *United States v. Chester,* although it dealt with a challenge to the constitutionality of 18 U.S.C. § 922(g)(9), a category of § 922(g) not specifically identified as one of *Heller's* "presumptively lawful regulatory measures," nevertheless discussed at some length felon dispossession and the debatable origin and import of the Supreme Court's "presumptively lawful" and "longstanding prohibition" language. *Chester,* 2010 WL 5396069, at \*5. As *Chester* noted, *Heller's* illustrative list of constitutionally permissible "longstanding prohibitions" is subject to two possible interpretations:

> **\*4** It is unclear to us whether *Heller* was suggesting that "longstanding prohibitions" such as these were historically understood to be valid limitations on the right to bear arms or did not violate the Second Amendment for some other reason.... But even if the listed regulations were not historical limitations on the scope of the Second Amendment, the Court could still have viewed the regulatory measures as "presumptively lawful" if it believed they were valid on their face under any level of means-ends scrutiny applied.

*Id.* (footnote omitted). Although the Fourth Circuit declined to resolve this debate, it is clear that, when applied to the newly-announced two-step framework for analyzing Second Amendment challenges, either of these interpretive strands passes constitutional muster.

First, the "presumptively lawful regulatory measures" could be considered "historical limitations" on the right to bear arms, thus regulating

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 145195 (S.D.W.Va.)
**(Cite as: 2011 WL 145195 (S.D.W.Va.))**

conduct entirely outside of the Second Amendment's protections. *Id.* As these regulations would accordingly not "burden ... conduct falling within the scope of the Second Amendment's guarantee ... at the time of ratification," they would be automatically valid under the first prong of *Chester's* Second Amendment framework. *Id.* at *6. Second, even if the "presumptively lawful regulatory measures" are considered to fail the historical test and burden protected conduct, they are still "valid on their face under any level of means-ends scrutiny applied ." *Id.* at *5. The regulations would thus presumptively satisfy the application of the "appropriate form of means-ends scrutiny" that makes up the second part of the *Chester's* Second Amendment framework. *Id.* at *6. Under either of these two mutually exclusive possibilities, § 922(g)(1) is thus constitutionally valid on its face. *See also Brunson,* 292 F. App'x at 261.

While this Court views its inquiry into the constitutionality of § 922(g)(1) as largely concluded by this language, *Chester* notes that "the phrase '*presumptively* lawful regulatory measures' suggests the possibility that one or more of these 'longstanding' regulations 'could be unconstitutional in the face of an as-applied challenge.' " *Chester,* 2010 WL 5396069, at *5 (emphasis in original) (quoting *United States v. Williams,* 616 F.3d 685, 692 (7th Cir.2010) (denying as-applied challenge to § 922(g)(1)). *Chester* does not further identify the "one or more" potentially vulnerable regulations to which this passage refers, nor does it expand any further on the implications of this phrasing. Moreover, as it does not relate directly to the issue at hand in *Chester,* this passage is likely dicta. The Court is reticent to read this passage as allowing for as-applied challenges, thereby inviting a raft of litigation concerning as-applied challenges to § 922(g)(1), particularly in light of the fact that, as Defendant candidly admits, no court has ever held that § 922(g)(1) is unconstitutional based upon *Heller* or *McDonald. See Williams,* 616 F.3d at 693 ("[E]very court to address the constitutionality of § 922(g)(1) in light of *Heller* has upheld that stat-

ute."). This includes courts considering as-applied challenges. *See, e.g., United States v. Ligon,* No. 3:04–cr–00185–HDM, 2010 WL 4237970 (D.Nev. Oct. 20, 2010) (collecting cases).

*5 This Court is not at all convinced that the language of *Heller* has left open the possibility of as-applied challenges to § 922(g)(1), despite the *Chester* dicta. Nonetheless, in the interests of completeness, the Court will briefly consider Defendant's arguments.

*B. 18 U.S.C. § 922(g)(1) is constitutional as applied to Defendant.*

Defendant attempts to distinguish his challenge to § 922(g)(1) on two bases. First, Defendant argues that his debilitating medical conditions and his need to travel across state lines with OxyContin pills necessitate that he carry a firearm to protect himself. Consequently, during the incident that gave rise to the instant indictment, Defendant alleges that he was preparing to travel to an out-of-state clinic to obtain his prescriptions and was carrying a firearm solely for self-defense.[FN4] Second, Defendant argues that his underlying felony conviction, delivery of hydrocodone in violation of West Virginia state law, was a non-violent drug offense in which a firearm was not involved. As such, Defendant argues that § 922(g)(1), as applied to him, "violates the fundamental individual right to self defense protected by the Second Amendment." (Docket 20 at 2.)

> FN4. This is Defendant's version of the facts. His prior conviction for delivery of hydrocodone, his presence at a residence where drug activity was suspected, and his admitted out of state travel to obtain (albeit prescribed) OxyContin raises an inference of less innocent circumstances.

*1. If § 922(g)(1) is a "historical limitation" on the right of felons to possess firearms, Defendant's as-applied challenge fails.*

Under the first step of *Chester,* the Court must determine whether § 922(g)(1) " 'imposes a burden

Not Reported in F.Supp.2d, 2011 WL 145195 (S.D.W.Va.)
**(Cite as: 2011 WL 145195 (S.D.W.Va.))**

on conduct falling within the scope of the Second Amendment's guarantee' ... at the time of ratification." *Chester,* 2010 WL 5396069, at *5 (quoting *Marzzarella,* 614 F.3d at 89). As a threshold matter, it is undisputed that § 922(g)(1) operates as a categorical ban on all firearm possession for certain persons. *Id.* at *6 (" Section 922(g)(9), like the felon-dispossession provision set forth in § 922(g)(1), permanently disarms an entire category of persons."). For such categorical bans, the threshold inquiry is "whether a person, *rather than the person's conduct,* is unprotected by the Second Amendment." *Id.* (emphasis added) (citing *Skoien,* 614 F.3d at 649 (Sykes, J., dissenting)).

Not surprisingly, the Government and Defendant disagree as to whether felons, particularly drug felons, were protected by the Second Amendment at the time of its ratification. The Fourth Circuit's uncertainty on this issue is well-documented. *Id.* ("[I]t appears to us that the historical data is not conclusive on the question of whether the founding era understanding was that the Second Amendment did not apply to felons.").[FN5] As such, the Court will not purport to resolve this debate. However, it can be briefly noted that, if § 922(g)(1) is a historical limitation on the right to bear arms, it infringes no Second Amendment interests and would be valid as applied to Defendant, his arguments notwithstanding. *Id.* at *5.

> FN5. After *Chester,* it is arguably the law in this circuit that the historical analysis of § 922(g)(1) is inconclusive and therefore unavailable.

*2. If § 922(g)(1) is not a "historical limitation" on the right of felons to possess firearms, Defendant's as-applied challenge fails.*

**\*6** If Defendant's Second Amendment rights are intact by virtue of the "inconclusive" historical evidence on felon dispossession, under the second step of the *Chester* framework, the Court must apply some form of heightened constitutional scrutiny to his as-applied claim. *Id.* (noting that "the [Supreme] Court would apply some form of

heightened constitutional scrutiny if historical evaluation did not end the matter."). Based on the Fourth Circuit's discussion in *Chester,* the Court finds intermediate scrutiny to be appropriate here.

Although Defendant argues for strict scrutiny given that he allegedly possessed the weapon in self-defense, this argument has been foreclosed by *Chester.* In *Chester,* the defendant made a similar push for strict scrutiny based on "his right to possess a firearm in the home for the purpose of self defense." *Id.* at *8. Dismissing this argument, the Fourth Circuit held that a domestic violence misdemeanant was outside of "the core right identified in *Heller,* " identified as "the right of a *law abiding, responsible* citizen to possess and carry a weapon in self defense," by virtue of his domestic violence conviction. *Id.* (emphasis in original). The Fourth Circuit concluded that intermediate scrutiny was the appropriate standard for the defendant and "similarly situated persons." *Id.* Similarly, Defendant's focus on his arguably heightened need for self-defense is irrelevant; Defendant is one or more steps removed from the "core right identified in *Heller* " by virtue of his felony conviction. *Id.* Therefore, intermediate scrutiny is appropriate. *Cf. Williams,* 616 F.3d at 692 (using intermediate scrutiny to analyze an as-applied challenge to § 922(g)(1)); *United States v. Oppedisano,* No. 09–CR–0305, 2010 WL 4961663 (E.D.N.Y. November 30, 2010) (same).

To pass constitutional muster under intermediate scrutiny, the Government must demonstrate "that there is a 'reasonable fit' between the challenged regulation and a 'substantial' government objective." *Chester,* 2010 WL 5396069, at *8 (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 480 (1989)). There can be little doubt that protecting the safety and lives of citizens and preventing crime is a compelling governmental interest. *See United States v. Solerno,* 481 U.S. 739, 750, 754–55 (1987). Section 922(g)(1) was enacted as part of the Gun Control Act of 1968, which sought to "keep guns out of the hands of those who

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 145195 (S.D.W.Va.)
**(Cite as: 2011 WL 145195 (S.D.W.Va.))**

have demonstrated that 'they may not be trusted to possess a firearm without becoming a threat to society.' " *United States v. Small,* 544 U.S. 385, 393 (2005) (citations omitted). This goal was accomplished by proscribing gun ownership and possession for certain classes of "presumptively dangerous individuals," among them convicted felons. *United States v. Kahoe,* 134 F.3d 1230, 1234 (4th Cir.1998). As the Government correctly notes, there is a "settled connection between drugs and firearms," *United States v.. Manigan,* 592 F.3d 621, 629 (4th Cir.2010), and firearms are considered "tools of the trade" in the illegal drug business. *United States v. Ward,* 171 F.3d 188, 195 (4th Cir.1999). Most importantly, it is well-established in the Fourth Circuit that "drugs and guns form a lethal combination that can lead to violence ." *Manigan,* 592 F.3d at 629 (quoting *United States v. Harris,* 128 F.3d 850, 852 (4th Cir.1997)). Keeping firearms out of the hands of convicted drug felons such as Defendant accomplishes the government's objective of both deterring and reducing drug-related violence.

**\*7** Notably, the Supreme Court in *Heller* did not make reference to categories or sub-categories of felons when carving out the "presumptively lawful regulatory measures." *Heller,* 544 U.S. at 626 –27 & n. 26. It is generally accepted that offending society by committing a crime leads legitimately to the loss of certain rights, such as the right to vote or serve on a jury. *See, e.g.,* 18 U.S.C. § 921(a)(33)(B)(ii) (referring to restoration of certain civil rights and inferring that such rights are stripped by virtue of a conviction under Title 18); *see also Beecham v. United States,* 511 U.S. 368, 373 n.\* (1994) (listing the right to vote and the right to serve on a jury among the federal civil rights lost upon felony conviction). Firearms prohibition is also a forfeited right. *See, e.g.,* W. Va.Code § 61–7–7. This loss of rights serves both as a form of punishment and as an incentive to deter future crimes. Other than incarceration, there may be no more effective deterrent to crime than the threat of the loss of firearms rights.

Defendant forfeited his firearms rights when he committed a felony drug offense in violation of state law. *Even if* the presumptively lawful § 922(g)(1) could be vulnerable to an as-applied challenge by a non-violent felon, *see Williams,* 616 F .3d at 693 (" § 922(g)(1) may be subject to an overbreadth challenge at some point because its disqualification of all felons, including those who are non-violent"), given the "settled connection between drugs and firearms," which are a "lethal combination that can lead to violence," this Defendant does not present a difficult test case for the Court. *Manigan,* 592 F.3d at 629. Thus, § 922(g)(1) is constitutionally applied to Defendant.[FN6]

> FN6. During argument, Defendant's counsel asserted that the "presumptively lawful" language in *Heller* resulted in a presumption of constitutionality that could somehow be rebutted. Defendant offered no authority for such a constitutional rebuttable presumption or for any standard by which a court might analyze such an argument. Therefore, the Court chooses not to attempt to analyze this issue by this method.

### III. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss [Docket 20] is **DENIED.**

**IT IS SO ORDERED.**

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

S.D.W.Va.,2011.
U.S. v. Lunsford
Not Reported in F.Supp.2d, 2011 WL 145195 (S.D.W.Va.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 35225 (N.D.Ind.)
**(Cite as: 2009 WL 35225 (N.D.Ind.))**

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Indiana,
Fort Wayne Division.
UNITED STATES of America
v.
Jason Lee SCHULTZ.

No. 1:08-CR-75-TS.
Jan. 5, 2009.

West KeySummary**Constitutional Law 92 ☜
3781**

92 Constitutional Law
  92XXVI Equal Protection
    92XXVI(F) Criminal Law
      92k3781 k. Creation and classification of
offenses. Most Cited Cases

**Weapons 406 ☜106(4)**

406 Weapons
  406I In General
    406k102 Constitutional, Statutory, and Regu-
latory Provisions
      406k106 Validity
        406k106(4) k. Violation of other rights
or provisions. Most Cited Cases
    (Formerly 406k3)

  The federal felon in possession of a firearm
statute did not violate the Equal Protection Clause.
The statute survived intermediate scrutiny because
there was a substantial governmental interest in
keeping firearms out of the hands of crime-prone
felons, and the statute substantially related to the
important governmental objective of public safety.
U.S.C.A. Const.Amend. 5; 18 U.S.C.A. § 922(g)(1)
.

Robert N. Trgovich, US Attorney's Office, Fort
Wayne, IN, for United States of America.

**OPINION AND ORDER**

THERESA L. SPRINGMANN, District Judge.
  **\*1** Before the Court is the Defendant's Motion
to Dismiss Indictment [DE 18], filed on November
12, 2008. The Government filed a Response [DE
19] on November 25, and the Defendant filed his
Reply [DE 22] on December 3.

**BACKGROUND**

  On September 24, 2008, the Defendant was
charged by way of an Indictment with two counts
of being a felon in possession of a firearm in viola-
tion of 18 U.S.C. § 922(g)(1). Both counts allege
that the Defendant is a convicted felon based on his
conviction for "Non-Support of a Dependent Child,
a Class D felony, in Whitley County Circuit Court,
in cause number 92C01-0409-FD-00166 on Febru-
ary 28, 2006." (Indictment 1, 2, DE 1.) The first
count alleges that on or about May 27, 2008, the
Defendant in Allen County, Indiana, which is in the
Northern District of Indiana, knowingly possessed
in and affecting commerce a firearm, specifically a
Belknap .20 gauge shotgun, model B-64. The
second count alleges that on or about June 16,
2008, the Defendant in Allen County, Indiana,
which is in the Northern District of Indiana, know-
ingly possessed in and affecting commerce a fire-
arm, specifically a Winchester lever action .22
caliber rifle, model 9422, serial number F576726.
The Indictment states that the shotgun was manu-
factured in Massachusetts, and the rifle was made
in Connecticut. The Indictment also includes a for-
feiture allegation.

**ANALYSIS**

  The Defendant makes several arguments in
support of dismissing the Indictment. First, he ar-
gues that the federal statute criminalizing posses-
sion of a firearm by a convicted felon is unconstitu-
tional-both as applied to the Defendant and on its
face-in light of *District of Columbia v. Heller, ---
U.S. ----, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).*
Second, the Defendant attacks the Indictment on
Commerce Clause grounds. He argues that, in light

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 35225 (N.D.Ind.)
**(Cite as: 2009 WL 35225 (N.D.Ind.))**

of *Heller's* holding, the mere allegation that a firearm was manufactured outside of the state of possession does not confer federal jurisdiction under the Commerce Clause. Third, he argues that the felon in possession statute violates the Defendant's rights under the Equal Protection Clause.

**A. Defendant's Argument that the Statute is Unconstitutional on its Face and as Applied to the Defendant in Light of *Heller***

The Defendant argues that *Heller* invalidates the felon in possession of a firearm statute, 18 U.S.C. § 922(g)(1), on its face and as applied to the Defendant. The Government disagrees and argues that the statute remains constitutional on its face and as applied to the Defendant.

In *Heller,* the Court considered a challenge under the Second Amendment to the District of Columbia's general ban on the possession of handguns, laws criminalizing the carrying of unregistered firearms, and a law requiring that lawfully owned firearms be unloaded and unassembled or bound by a trigger lock or similar device. 128 S.Ct. at 2788. The Court held that "that the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." *Id.* at 2821-22. The Court based this ruling on its holding that "the Second Amendment conferred an individual right to keep and bear arms." *Id.* at 2799.

**\*2** However, the Court noted that:

Like most rights, the right secured by the Second Amendment is not unlimited.... [N]othing in our opinion should be taken to cast doubt on *longstanding prohibitions on the possession of firearms by felons* and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 2816-17 (emphasis added). The Court

noted that "[w]e identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 2817 n. 26.

Regardless of other language in the opinion, this language is clear: the Supreme Court in *Heller* was not casting doubt on the constitutional validity of laws banning the possession of firearms by felons. This Court can only follow that clear, unambiguous instruction as it applies to the challenged felon-in-possession statute in this case and conclude that the law is indeed constitutional on its face and as applied to the Defendant.

The Supreme Court's clear instructions make irrelevant the fact (as asserted by the Defendant) that the statute in this case is more restrictive than the laws at issue in *Heller,* or that the Defendant's Class D felony conviction was for a non-violent offense (failure to pay child support), is twenty years old, and resulted in a term of probation. The Supreme Court did not make an exception for certain kinds of felony convictions or certain circumstances. There is no wiggle room to distinguish the present case from the Supreme Court's blanket statement.

The Defendant in his Reply claims that the Supreme Court "has an express disclaimer of any intent to settle all questions that would arise in future cases," (Def. Reply 1), because it stated "there would be 'time enough to expound upon the historical justifications for the exceptions that we have mentioned if and when those exceptions come before [the Court],' " (*id.*) (quoting *Heller,* 128 S.Ct. at 2821). The Supreme Court did not disclaim an intent to settle all questions that would arise in the future. Quite the contrary, it set out several examples of questions (regarding bans on felons and the mentally ill possessing firearms and laws banning firearms "in sensitive places such as school and government buildings," 128 S.Ct. at 2817), that might arise given its ruling and provided the answer ("nothing ... should be taken to cast doubt," *id.,* on such laws) to those limited questions. What the Su-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 35225 (N.D.Ind.)
**(Cite as: 2009 WL 35225 (N.D.Ind.))**

preme Court left for itself in future cases was to "expound upon the historical justifications," *id.* at 2821, for the limits on the right to keep and bear arms. That the Supreme Court reserved for itself this task does not provide a basis for this Court to rule the challenged gun law unconstitutional, especially, as stated several times, in light of the Supreme Court's explicit statement that such laws are not in "doubt" in light of *Heller.*

**\*3** The Defendant is unable to point to any post-*Heller* ruling that has declared this statute or a similar one to be unconstitutional. To the contrary, as the Government points out, every court to consider the issue since *Heller* has ruled that the statute is constitutional. (Govt.Resp.6-7) (collecting cases); *see also United States v. Li,* No. 08-CR-212, 2008 WL 4610318 (E.D.Wis. Oct.15, 2008) (denying a motion to dismiss indictment on charges of being a felon in possession of a firearm after *Heller* ); *United States v. Yancey,* No. 08-CR-103-BBC, 2008 WL 4534201 (W.D.Wis. Oct.3, 2008) (same); *Reynolds v. Sherrod,* No. 08-CV-506-JPG, 2008 WL 3287042 (S.D.Ill. Aug.8, 2008) (dismissing as "meritless" a habeas corpus petition that sought to invalidate a conviction for being felon in possession of a firearm in light of *Heller* ). Unless and until the Seventh Circuit or the Supreme Court rules otherwise, this Court is bound to rule that 18 U.S.C. § 922(g)(1) is constitutional on its face and as applied to the Defendant.

**B. Defendant's Argument that the Mere Allegation that the Firearm was Manufactured Out of State Does Not Confer Federal Jurisdiction**

The Defendant's argument here goes as follows: When the allegation under the statute is only that the firearm traveled in interstate commerce in the past and the Defendant is accused merely of intrastate firearm possession, the statute exceeds the limits of the Commerce Clause and violates the Tenth Amendment, especially in light of *Heller.*

The Government states that the firearms were not manufactured in Indiana, (Govt.Resp.2), and

the Defendant did not contest this. The Defendant stated: "The only nexus with interstate commerce appears to be research on the part of an ATF agent suggesting that the firearms were manufactured outside the state of Indiana." (Def. Mot. to Dismiss 1.) This is not a denial that the firearms were manufactured outside of Indiana. The Defendant further states: "The discovery contains neither information regarding how the firearms came to be present in Indiana, nor any allegation that Mr. Schultz had any involvement with the transport of the firearms to North Carolina." (*Id.*)

For the Commerce Clause challenge, the Defendant relies on *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), which declared that a federal law criminalizing possession of a firearm in a school zone exceeded Congress's Commerce Clause authority because "[t]he possession of a gun in a local school zone is in no sense an economic activity that might ... substantially affect any sort of interstate commerce." *Id.* at 567. The Defendant implies that *Lopez* overrules or casts doubt on *United States v. Scarborough,* 431 U.S. 563, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977), which held that "the interstate commerce nexus requirement of the possession offense was satisfied by proof that the firearm petitioner possessed had previously traveled in interstate commerce," *id. at* 566. The Defendant cites opinions [FN1] from other circuits, including concurring or dissenting opinions, in support of the view that *Lopez* makes 18 U.S.C. § 922(g)(1) unconstitutional "where the only interstate commerce nexus is the mere fact that firearms at some point traveled interstate." (Def. Mot. to Dismiss 7.)

> FN1. None of these cases actually declared that the felon-in-possession statute is invalid under the Commerce Clause and *Lopez.*

**\*4** The suggestions of opinions in other circuits do not matter in this case because the Seventh Circuit has upheld the felon in possession of a firearm statute on Commerce Clause grounds after *Lopez,*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 35225 (N.D.Ind.)
**(Cite as: 2009 WL 35225 (N.D.Ind.))**

see, e.g., *United States v. Juarez,* 454 F.3d 717, 719 (7th Cir.2006) (stating that "[w]e have rejected similar challenges ... concluding that the statute's inclusion of a jurisdictional element insulates it from constitutional attack under the reasoning of *United States v. Lopez"* ). So that aspect of the Defendant's argument is foreclosed.

In *Juarez,* the Seventh Circuit noted that in light of a stipulation that the gun was manufactured in Ohio, "[i]t is undisputed that the gun must have traveled in interstate commerce at some point after its manufacture in order for *Juarez to possess it in Illinois."* 454 F.3d at 719; *see also United States v. Lemons,* 302 F.3d 769, 772 (7th Cir.2002) (rejecting Commerce Clause challenge when the gun crossed into Wisconsin "at some indeterminate moment in time" before it was discovered in the defendant's possession"). In this case, the Indictment states that the shotgun was made in Massachusetts and the rifle was made in Connecticut. (Indictment 3, DE 1.) The Defendant does not dispute these facts. For the weapons to be found in the possession of the Defendant in Allen County, Indiana, as alleged, they had to have traveled in interstate commerce.

The Defendant does not clearly articulate how *Heller's* holding-that there is an individual right to keep and bear arms [FN3]-scales back the Commerce Clause authority of 18 U.S.C. § 922(g)(1), other than to say that "the Supreme Court has not addressed the validity of Congress's exercise of its commerce power in the context of the fundamental right to bear arms guaranteed by the Second Amendment." (Def. Mot. to Dismiss 8.) That is true, insofar as the Supreme Court has not considered a Commerce Clause challenge to the statute since deciding *Heller.* But that does not mean, as the Defendant urges, that "the tenuous, commerce-based jurisdiction now endangered by the Supreme Court's Commere Clause jurisprudence must give way." (*Id.*)

> FN2. The Defendant indicates that *Heller* held that there is a "fundamental right to

bear arms guaranteed by the Second Amendment." (Def. Mot. to Dismiss 8.) *Heller* did not state that the individual right to keep and bear arms is a "fundamental" right. The Court used the word "fundamental" twice in its opinion. "By the time of the founding, the right to have arms had become fundamental for English subjects." 128 S.Ct. at 2798. "Blackstone ... cited the arms provision of the Bill of Rights as one of the fundamental rights of Englishmen." *Id.* Neither of these sentences supports the claim that the *Heller* Court found a fundamental right to bear arms, especially because the Court did not use that word in its holding or conclusion.

There is nothing tenuous about the federal jurisdiction based on the Commerce Clause, which is as alive as ever after *Lopez. See United States v. Raich,* 545 U.S. 1, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) (rejecting a Commerce Clause challenge to a federal law criminalizing the home cultivation and intrastate use of marijuana for medical purposes even when authorized by California law). *Raich* made clear that it was consistent with *Lopez,* 545 U.S. at 23-25. In the absence of language in *Heller* [FN3] or any other controlling case indicating that the individual right to bear arms reduces Commerce Clause federal jurisdiction, there is no basis for this Court to so rule.

> FN3. Not only does the *Heller* opinion give no hint that it chips away at federal jurisdiction under the Commerce Clause, but it states, as already mentioned, that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons ... or laws imposing conditions and qualifications on the commercial sale of arms." 128 S.Ct. at 2816-17. This language expressly seeks to preserve federal jurisdiction based on the Commerce Clause.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 35225 (N.D.Ind.)
**(Cite as: 2009 WL 35225 (N.D.Ind.))**

The Defendant does not provide much elaboration for his Tenth Amendment argument, except to say that it is "implicated by overly broad assertions of federal jurisdiction." (Def. Mot. to Dismiss 7.) The Seventh Circuit has upheld 18 U.S.C. § 922(g) against a Tenth Amendment challenge. *United States v. Hemmings,* 258 F.3d 587, 594 (7th Cir.2001); *see also Gillespie v. City of Indianapolis,* 185 F.3d 693, 706-08 (7th Cir.1999) (ruling that 18 U.S.C. § 922(g) (9), which prohibits persons convicted of a misdemeanor crime of domestic violence from possessing a firearm, does not violate the Tenth Amendment). The Defendant does not explain how *Heller's* holding changes the Tenth Amendment implications of the statute. Without any argument based on controlling legal authority to the contrary, this Court is bound to rule that the statute does not violate the Tenth Amendment.

## C. Defendant's Argument that the Statute Violates the Equal Protection Clause

**\*5** The Defendant argues that the felon in possession statute violates the Defendant's rights under the Equal Protection Clause because the statute has "no uniform definition of the conduct that will result in a loss of the right to possess firearms under federal law, instead relying on diverse state definitions" of felony crimes. (Def. Mot. to Dismiss 9.) The Defendant urges the Court to apply strict scrutiny to invalidate the law, but also argues that the statute does not even meet the rational basis test. (*Id.* at 10.)

The Defendant argues that *Lewis v. United States,* 445 U.S. 55, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980), which upheld a predecessor felon in possession law, cannot be the basis for ruling that the current statute is constitutional in light of *Heller's* purported recognition of "the fundamental, individual right to bear arms." (Def.Mot.10.) However, as mentioned earlier, *Heller* did not declare that this right is fundamental, so this cannot be a basis for this Court to declare the present statute unconstitutional. *See United States v. Bernal,* No. L-08-321, 2008 WL 2078164, at \*5 (S.D.Tex. May 15, 2008)

(relying on *Lewis* to reject an equal protection challenge to the statute after *Heller* ).

The Government is correct that the Supreme Court used the rational basis standard to uphold a predecessor felon in possession statute against a Due Process claim in *Lewis,* and that *Heller* did not explicitly adopt a level of scrutiny for Second Amendment challenges. But the Court reads footnote twenty-seven in *Heller* as requiring a tougher standard of review than the rational basis standard. "Obviously, the [rational basis] test could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or *the right to keep and bear arms.*" 129 S.Ct. at 2817, n. 27 (emphasis added). The Court then noted that application of the rational basis test to the right to keep and bear arms would mean that the Second Amendment "would have no effect." *Id.* On the other hand, because the Supreme Court did not state the there is a fundamental right to keep and bear arms, strict scrutiny does not apply. That leaves intermediate scrutiny. *See United States v. Bledsoe,* No. SA-08-CR13(2)-XR, 2008 WL 3538717, at \*4 (W.D.Tex. Aug.8, 2008) (applying intermediate scrutiny to a *Heller*-based equal protection challenge). "To withstand intermediate scrutiny, a statutory classification must be substantially related to an important governmental objective." *Clark v. Jeter,* 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) (quoted in *Bledsoe,* 2008 WL 3538717, at \*4).

Public safety is an important governmental objective. *Cf. United States v. Salerno,* 481 U.S. 739, 750, 754, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (stating that preventing crime is a compelling interest); *Doe v. City of Lafayette, Ind.,* 377 F.3d 757 (7th Cir.2004) (upholding ban on convicted sex offender being present in parks because of a non-punitive governmental objective of keeping children safe) (collecting cases with similar holdings); *Rapier v. Harris,* 172 F.3d 999, 1004 (7th Cir.1999) (stating that maintaining order and discipline in a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 35225 (N.D.Ind.)
**(Cite as: 2009 WL 35225 (N.D.Ind.))**

detention facility is an important governmental objective). Persons who have committed felonies are more likely to commit crimes than those who have not.[FN4] Efforts to keep firearms out of the hands of crime-prone felons, such as the challenged statute in this case, deter crime and result in the arrest, conviction, and imprisonment of offenders.[FN5] *See* 18 U.S.C. § 3553(a)(2)(A)-(C) (a sentence of imprisonment should "promote respect for the law," "afford adequate deterrence to criminal conduct," and "protect the public from further crimes of the defendant"). Therefore, there is a substantial governmental interest in keeping firearms out of the hands of crime-prone felons. A federal law doing so, such as the current statute, substantially relates to that important governmental objective of public safety.[FN6] As a result, the Court finds that the felon in possession of a firearm statute, 18 U.S.C. § 922(g)(1), is not unconstitutional under the Equal Protection Clause. *See United States v. Irish,* 285 F. App'x 326 (8th Cir.2008) (rejecting a *Heller*-based Equal Protection Clause challenge to the statute without stating what level of scrutiny the court employed); *Bledsoe,* 2008 WL 3538717 (same but using intermediate scrutiny), at *4; *Bernal,* 2008 WL 2078164, at *5 (same but using the rational basis test).

> FN4. *Compare* Bureau of Justice Statistics, Department of Justice, NJC 193427, Recidivism of Prisoners Release in 1994 (June 2002), http:// www.ojp.usdoj.gov/bjs/pub/pdf/rpr94.pdf, (finding that more than two-thirds of about 300,000 prisoners released in 15 states in 1994 were rearrested in three years) *with* Bureau of Justice Statistics, Department of Justice, NJC 197976, Prevalence of Imprisonment in the U.S. Population, 1974-2001 (August 2003), ht-tp://www.ojp.usdoj.gov/bjs/pub/pdf/piusp0 1.pdf (finding that an estimated one of every fifteen persons, or 6.6%, will serve time in a prison during their lifetime).

FN5. *E.g.,* BJS's Federal Justice Statistics Program, Department of Justice, ht-tp://fjsrc.urban.org (table created Dec. 17, 2008) (showing that for the cases that were closed in fiscal year 2006, 5078 defendants were convicted under 18 U.S.C. § 992(g)).

FN6. The Defendant argues in his Reply that not all felons are violent, the crime of being a felon in possession of a firearm is not a crime of violence *per se,* and that "[t]here is no empirical data suggesting that persons convicted of non-violent felonies ... are more likely to seek guns or use them than other, non-convicted persons." (Def. Reply 2.) Without a factual basis for these statements, the Court is not persuaded that these factual assertions are correct. But even assuming these are true for the moment, the Court finds that the challenged statute still substantially relates to the important governmental objective of public safety.

## CONCLUSION

**\*6** For the foregoing reasons, the Defendant's Motion to Dismiss Indictment [DE 18] is DENIED. The Ruling Conference for Monday, January 5, 2009, at 3 p.m. is REAFFIRMED. The Court will initiate the call.

So ORDERED.

N.D.Ind.,2009.
U.S. v. Schultz
Not Reported in F.Supp.2d, 2009 WL 35225 (N.D.Ind.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.