IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JULIO SUAREZ, | ) | Case. No. 14-CV-00968-WWC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ERIC H. HOLDER, JR., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Comes now Plaintiff, Julio Suarez, by and through undersigned counsel, and

submits his Memorandum of Points and Authorities in Support of his Motion for

Summary Judgment and in Opposition to Defendants' Motion to Dismiss or, in the

Alternative, for Summary Judgment.

Dated: November 13, 2014          Respectfully submitted,

By: /s/ Douglas Gould          By: /s/Alan Gura
    Douglas Gould (PA Bar No. 78357)     Alan Gura
    Law Offices of Douglas T. Gould, P.C.     Gura & Possessky, PLLC
    925 Glenbrook Avenue     105 Oronoco Street, Suite 305
    Bryn Mawr, PA 19010     Alexandria, VA 22314
    610.520.6181/Fax 610.520.6182     703.835.9085/Fax703.997.7665
    dgould@gouldlawpa.com     alan@gurapossessky.com

                                Attorneys for Plaintiff

# TABLE OF CONTENTS

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    1.    *Julio Suarez's Personal History*. . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    2.    *The Regulatory Scheme* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    3.    *Defendants' Thwarting of Plaintiff's Presently Intended Transactions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    I.    Section 922(g)(1) Does Not Bar Suarez from Possessing Firearms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        A.    Ambiguous Criminal Statutes Are Afforded the Most Lenient Construction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        B.    Section 922(g)(1) Does Not Apply to Misdemeanors Capable of Being Punished By Less Than Two Years' Imprisonment. . . . 13

        C.    Courts Must Avoid Constitutional Questions Where Alternative Statutory Interpretations Raising No Constitutional Concerns Are "Fairly Possible". . . . . . . . . . . . 25

        D.    Precedent Predating the Second Amendment Right's Recognition Cannot Support Constitutionally Now-Dubious Interpretations of the Felon-In-Possession Ban. . . . . . . . . . . . 26

II.   The Second Amendment Bars Section 922(g)(1)'s Application
      Against Suarez on Account of His Misdemeanor. . . . . . . . . . . . . . 30

      A.   The Two-Step Framework for Analyzing Facial Second
           Amendment Challenges is Inapplicable to Suarez's
           As-Applied *Barton* Challenge.. . . . . . . . . . . . . . . . . . . . . . . . 32

      B.   "Traditional Justifications" Do Not Support "A Finding of
           Permanent Disability in This Case".. . . . . . . . . . . . . . . . . . . 36

      C.   Suarez Has Presented Sufficient "Facts About Himself"
           Demonstrating Rehabilitation. . . . . . . . . . . . . . . . . . . . . . . 46

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

TABLE OF AUTHORITIES

Cases

*Abramski* v. *United States*,
    134 S. Ct. 2259 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Adirondack Med. Ctr.* v. *Sebelius*,
    740 F.3d 692 (D.C. Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Atl. Cleaners & Dyers, Inc.* v. *United States*,
    286 U.S. 427 (1932). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Binderup* v. *Holder*, No 13-6750,
    2014 U.S. Dist. LEXIS 135110 (E.D. Pa. Sept. 25, 2014).   2, 29, 34-36, 44,
                                                      49-51

*Bond* v. *United States*,
    134 S. Ct. 2077 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Britt* v. *State*,
    363 N.C. 546, 681 S.E.2d 320 (N.C. 2009). . . . . . . . . . . . . . . . . . . . . . 41

*Burrage* v. *United States*,
    134 S. Ct. 881 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Coca-Cola Bottling Co.* v. *Coca-Cola Co.*,
    988 F.2d 386 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Comm'r* v. *Lundy*,
    516 U.S. 235 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Crandon* v. *United States*,
    494 U.S. 152 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Davis* v. *United States*,
    131 S. Ct. 2419 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Dickens* v. *Ryan*,
    688 F.3d 1054 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*District of Columbia* v. *Heller*,
    554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . 10, 28, 30-32, 34-36, 40

*Drake* v. *Filko*,
    724 F.3d 426 (3d Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 39, 40

*Dutton* v. *Pennsylvania*,
    503 Fed. Appx. 125 (3d Cir. 2012) (per curiam). . . . . . . . . . . . . . . . 20, 43

*Dutton* v. *Pennsylvania*, No. 11-7285,
    2012 U.S. Dist. LEXIS 102653 (E.D. Pa. July 23, 2012). . . . . . . . . . . . . 20

*Envtl. Def.* v. *Duke Energy Corp.*,
    549 U.S. 561 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Estate of Cowart* v. *Nicklos Drilling Co.*,
    505 U.S. 469 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Gowder* v. *City of Chicago*,
    923 F. Supp. 2d 1110 (N.D. Ill. 2012). . . . . . . . . . . . . . . . . 2, 34, 42, 50

*Harris* v. *United States*,
    536 U.S. 545 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Iselin* v. *United States*,
    270 U.S. 245 (1926) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Jones* v. *United States*,
    529 U.S. 848 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Kachalsky* v. *Cnty. of Westchester*,
    701 F.3d 81 (2d. Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Lamie* v. *United States Tr.*,
    540 U.S. 526 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Lewis* v. *City of Chicago*,
 560 U.S. 205 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Lewis* v. *United States*,
 445 U.S. 55 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Logan* v. *United States*,
 552 U.S. 23 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Moore* v. *Madigan*,
 702 F.3d 933 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Nat'l Fed'n of Indep. Bus.* v. *Sebelius*,
 132 S. Ct. 2566 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Nat'l Rifle Ass'n of Am., Inc.* v. *McCraw*,
 719 F.3d 338 (5th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Omega Overseas, Ltd.* v. *Griffith*, No. 13-CV-4202,
 2014 U.S. Dist. LEXIS 109781 (S.D.N.Y. Aug. 7, 2014) . . . . . . . . . . . . 21

*PDK Labs. Inc.* v. *United States DEA*,
 362 F.3d 786 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Peruta* v. *County of San Diego*,
 742 F.3d 1144 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Prestol Espinal* v. *AG of the United States*,
 653 F.3d 213 (3d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Public Citizen, Inc.* v. *Rubber Mfrs. Ass'n*,
 533 F.3d 810 (D.C. Cir.2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Russello* v. *United States*,
 464 U.S. 16 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Scarborough* v. *United States*,
 431 U.S. 563 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Schrader* v. *Holder*,
   704 F.3d 980 (D.C. Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . 23-25, 30, 31

*Sorenson* v. *Sec'y of Treasury*,
   475 U.S. 851 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Sykes* v. *United States*,
   131 S. Ct. 2267 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States* v. *Apel*,
   134 S. Ct. 1144 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States* v. *Augustin*,
   376 F.3d 135 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States* v. *Barton*,
   633 F.3d 168 (3d Cir. 2011) . . . . . . . . . 2, 29-36, 40, 41, 43, 46, 47, 50, 52

*United States* v. *Bass*,
   404 U.S. 336 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 37

*United States* v. *Batchelder*,
   442 U.S. 114 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States* v. *Burke*,
   781 F.2d 1234 (7th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States* v. *Chester*,
   628 F.3d 673, 679 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . 30, 35

*United States* v. *Chovan*,
   735 F.3d 1127 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States* v. *Cleveland Indians Baseball Co.*,
   532 U.S. 200 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States* v. *Coleman*,
   158 F.3d 199 (4th Cir. 1998) (en banc). . . . . . . . . . . . . . . . . . . . . 24, 25

*United States* v. *Corle*,
  222 Fed. Appx. 121 (3d Cir. 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States* v. *Duggan*,
  657 F.3d 998 (9th. Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States* v. *Essig*,
  10 F.3d 968 (3d Cir. 1993).. . . . . . . . . . . . . . . . . . . . 6, 14, 19, 22, 26-28

*United States* v. *Jones*,
  673 F. Supp. 2d 1347 (N.D. Ga. 2009).. . . . . . . . . . . . . . . . . . . . . . . . 48

*United States* v. *Leuschen*,
  395 F.3d 155 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 23, 25

*United States* v. *Locke*,
  471 U.S. 84 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States* v. *Marzzarella*,
  614 F.3d 85 (3d Cir. 2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 35

*United States* v. *Moore*,
  666 F.3d 313 (4th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States* v. *Nachtigal*,
  507 U.S. 1 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States* v. *Oppedisano*, No. 09-CR-0305,
  2010 U.S. Dist. LEXIS 127094 (E.D.N.Y. Nov. 30, 2010). . . . . . . . . . . 48

*United States* v. *Rehlander*,
  666 F.3d 45 (1st Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28

*United States* v. *Rodriguez*,
  527 F.3d 221 (1st Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States* v. *Rybar*,
  103 F.3d 273 (3d Cir. 1996).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States* v. *Santos*,
  553 U.S. 507 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States* v. *Schoolcraft*,
  879 F.2d 64 (3d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States* v. *Tot*,
  131 F.2d 261 (3d Cir. 1942). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States* v. *Williams*,
  616 F.3d 685 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 33

*United States* v. *Yancey*,
  621 F.3d 681 (7th Cir. 2010) (per curiam) . . . . . . . . . . . . . . . . . . . . . . 45

*Util. Air Regulatory Grp.* v. *EPA*,
  134 S. Ct. 2427 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Whitman* v. *United States*, No. 14-29,
  __ U.S. __, 2014 U.S. LEXIS 7431 (Nov. 10, 2014) . . . . . . . . . . . . . . . 11

*Woollard* v. *Gallagher*,
  712 F.3d 865 (4th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39


Statutes, Rules, and Ordinances

18 Pa. C.S. § 6105(d)(3)(ii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

18 U.S.C. § 921(a)(20). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 14, 19

18 U.S.C. § 921(a)(20)(B). . . . . . . . . . . . . . . . . . 10, 11, 14, 15, 18-24, 29

18 U.S.C. § 922(g)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 922(g)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 45

18 U.S.C. § 922(g)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

18 U.S.C. § 924(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

18 U.S.C. § 925(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

27 C.F.R. § 478.124. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

720 ILCS 5/24-1(a)(10) (1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Chi. Mun. Code § 8-20-110(b)(3)(iii) (2010). . . . . . . . . . . . . . . . . . . . . . . . 42

Md. Ann. Code art. 27, § 36B(b) (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Third Cir. Internal Op. P. 5.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43


Other Authorities

114 Cong. Rec. 14773 (1968).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

BLACK'S LAW DICTIONARY (9th ed., 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*,
    32 HARV. J. L. & PUB. POL'Y 695 (2009). . . . . . . . . . . . . . . . . . . . . . . . . 36

Norman J. Singer, 3 SUTHERLAND ON STATUTORY CONSTRUCTION (7th ed. 2008)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 26

S. Rep. No. 88-1340 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

U.S. Gen. Accounting Office, *States' Laws and Requirements for*
    *Concealed Carry Permits Vary Across Nation* (2012),
    available at http://www.gao.gov/assets/600/592552.pdf
    (last visited November 11, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

WEBSTER'S NEW INTERNATIONAL DICTIONARY (3d ed. 1961). . . . . . . . . . . 14

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

## INTRODUCTION

Julio Suarez has not lived a blameless life, but neither is he anyone's idea of a serious criminal. A dedicated family man, leader in his church, decorated Army veteran, and defense contractor holding a security clearance issued by the same government that would disarm him, Suarez was convicted—twenty-four years ago—of one misdemeanor count of carrying a handgun without a license.

For this one ancient transgression, the Government argues, Suarez must permanently forfeit his fundamental Second Amendment right to keep and bear arms. Pennsylvania does not agree; a state court has removed the state law disability of his firearm rights. Perhaps more critically, it is far from clear that Congress agrees Suarez should be so disabled. And in the event that his decades-old misdemeanor would ensnare him under 18 U.S.C. § 922(g)(1)'s so-called "felon in possession" ban,[1] controlling Third Circuit precedent, consistent with that of nearly every federal appellate court to have considered the matter, indicates that applying this far-reaching prohibition to Suarez violates his fundamental Second

---

[1] All further statutory references are to Title 18 of the United States Code unless otherwise noted.

1

Amendment rights. See *United States* v. *Barton*, 633 F.3d 168 (3d Cir. 2011).

Indeed, one court has already struck down imposition of a firearms disability for an

unlawful carrying misdemeanor. See *Gowder* v. *City of Chicago*, 923 F. Supp. 2d

1110 (N.D. Ill. 2012).

To be sure, in the megabyte department, the Government wins. Suarez

cannot match the overwhelming volume of utterly extraneous material the

Government has uploaded to ECF—none of which overrules precedent entitling

Suarez to a judgment. Indeed, although the Government barely mentions and does

not truly acknowledge the development, only months ago it lost a substantially

similar case in the Eastern District, which the parties litigated in much the same

way. See *Binderup* v. *Holder*, No 13-6750, 2014 U.S. Dist. LEXIS 135110 (E.D.

Pa. Sept. 25, 2014).

The glossing-over of *Binderup* is consistent with the short-shrift the

Government affords *Barton*, which dictated *Binderup*'s outcome, and which could

dictate the same outcome here—unless this Court were to depart from *Binderup* on

the issue of Suarez's statutory claim. Indeed, the Eastern District's decision to

follow *Barton* was aided by the Government's concession at oral argument, offered

by the same counsel representing the Government here, that *Barton* would likely

prove controlling on appeal should the case be decided on constitutional grounds.

2

STATEMENT OF FACTS

The parties disagree on the law, but the basic facts stand beyond dispute.

1.    *Julio Suarez's Personal History*

Julio Suarez, residing in Gettysburg, Adams County, Pennsylvania, presently intends to purchase and possess a handgun and long gun for self-defense within his own home. Statement of Material Facts ("SMF") 1. Suarez is over the age of 21, is not under indictment, has never been convicted of a felony or misdemeanor crime of domestic violence, is not a fugitive from justice, is not an unlawful user of or addicted to any controlled substance, has not been adjudicated a mental defective or committed to a mental institution, has not been discharged from the Armed Forces under dishonorable conditions, has never renounced his citizenship, and has never been the subject of a restraining order relating to an intimate partner. SMF 2.

On June 26, 1990, Suarez was convicted by the Montgomery County (Maryland) District Court of one misdemeanor count of carrying a handgun without a license, in violation of Md. Ann. Code art. 27, § 36B(b) (1990) ("Section 36B(b)"). SMF 3. Section 36B(b) was a misdemeanor punishable by up to three years imprisonment, but carried no mandatory minimum sentence. SMF 4. Suarez had volunteered to the officers who stopped him that he had a gun in the

car. SMF 5. He was not convicted of any other offense arising from the incident. SMF 6.

Suarez was sentenced to one year probation, as well as 180 days imprisonment and a $500 fine, both suspended. SMF 7. He paid costs totaling $25 and successfully completed probation. SMF 8. Apart from one 1998 misdemeanor conviction for driving under the influence, acquired after celebrating the sale of the company for which he then worked, Suarez has not since been convicted of any violation. SMF 9.

Suarez has been married for 20 years, and is in the process of successfully raising three children. SMF 10. He is an Elder in his local Presbyterian Church, SMF 11, and holds a "Secret" security clearance in connection with employment for a government contractor. SMF 12. Suarez is an honorably discharged Army veteran, awarded the Army Commendation Medal as well as the Army Achievement Medal during his service. SMF 13. Suarez holds a Bachelor of Science degree, cum laude, from Towson University. SMF 14. He is a Certified Licensing Professional. SMF 15.

In the 1990s, Suarez was much younger and less responsible than he is today. But while Suarez acknowledges that he made mistakes, he has never been an alcoholic, nor did he abuse alcohol on a regular basis at any time in his life, nor

4

does he abuse alcohol today. Alcohol simply does not interfere with Suarez's life in any way, and it has not adversely impacted his life since the 1998 DUI conviction. SMF 16.

On August 31, 2009, the Court of Common Pleas of Adams County, Pennsylvania, granted Suarez's petition for removal of disqualification from owning or possessing firearms, pursuant to 18 Pa. C.S. § 6105(d)(3)(ii). SMF 17.

2.    *The Regulatory Scheme*

Section 922(g)(1) prohibits the possession of firearms by any person convicted of "a crime punishable by imprisonment for a term exceeding one year." Violation of this provision is a felony punishable by fine and imprisonment of up to ten years. See 18 U.S.C. § 924(a)(2).

The term "crime punishable by imprisonment for a term exceeding one year" "does not include . . . (B) any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less." 18 U.S.C. § 921(a)(20). Defendants have taken the position that the term "crime punishable by imprisonment for a term exceeding one year" includes state misdemeanors carrying statutory sentencing ranges exceeding two years, without regard to any mandatory minimum sentence. Without much discussion, the Third

Circuit once accepted this characterization. *United States* v. *Essig*, 10 F.3d 968 (3d Cir. 1993).

Section 922(d)(1) prohibits anyone from transferring firearms or ammunition to anyone whom the transferor has reason to know was convicted of "a crime punishable by imprisonment for a term exceeding one year." Violation of this provision is a felony criminal offense punishable by fine and imprisonment of up to ten years. See 18 U.S.C. § 924(a)(2).

All firearms purchasers within the United States who do not possess a Federal Firearms License, meaning, virtually all ordinary civilian firearms consumers, must complete "Form 4473, Firearms Transaction Record Part I – Over-The-Counter," administered under Defendants' authority, in order to purchase a firearm. 27 C.F.R. § 478.124. Question 11(c) on Form 4473 asks:

> Have you ever been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation?

SMF 18. Defendants instruct firearm dealers not to sell firearms to anyone who answers "yes" to this question. Indeed, Defendants instruct firearm dealers to refrain from even running a background check on anyone who answers yes to this question, and simply to deny the transaction on the basis of that answer. SMF 19.

3.    *Defendants' Thwarting of Plaintiff's Presently Intended Transactions*

Suarez desires and intends to possess firearms for self-defense and for defense of his family. SMF 20. Suarez refrains from obtaining a firearm only because he reasonably fears arrest, prosecution, incarceration and fine, under Section 922(g)(1), instigated and directed by Defendants, should he follow through with his plan to obtain a firearm. SMF 21. Suarez refrains from purchasing a firearm from a private party, because doing so would subject him to arrest, prosecution, fine, and incarceration, at Defendants' instigation and direction, for violating 18 U.S.C. § 922(g)(1). SMF 22.

Considering Defendants' interpretation of federal law, Suarez is unwilling to state on Form 4473 that he has not, in fact, been convicted of a crime punishable by imprisonment for over one year. SMF 23. But should Suarez answer, on Form 4473, that he has been convicted of a crime punishable by imprisonment for over one year, any federal firearms licensee who follows Defendants' directives would refuse to sell Suarez a firearm. Thus, Suarez suffers the on-going harm of being unable to obtain firearms, which he would, in fact, obtain but for Defendants' enforcement of Section 922(g)(1). SUF 24.

SUMMARY OF ARGUMENT

As the Third Circuit instructs, Section 922(g)(1)'s "felon-in-possession" prohibition is not constitutional where its application would be inconsistent with the historical practice of barring firearms to dangerous individuals. Julio Suarez committed a non-violent misdemeanor offense nearly a quarter-century ago, for which he has been fully rehabilitated. His transgression did not involve force, the threat of force, or even basic dishonesty—he merely exercised his constitutional right to bear arms without obtaining a required license. In the years since, Suarez has distinguished himself as a valuable member of society—as a husband and father, a church leader, a successful businessman—he has even earned the Government's trust in the defense industry.

If the Government can entrust Suarez with state secrets, it should be able to trust him with a simple handgun in defense of his home and family. Indeed, a state court has since determined that Suarez is safe and trustworthy with firearms. Unfortunately, rather than admit that it lacks any evidence whatsoever showing that Suarez's disarmament serves any useful purpose, the Government dregs up allegations that Suarez was inebriated twenty-four years ago at the time of his arrest.

Suarez's character is fair game in this type of proceeding, but this line of argument is absurd. Suarez is not disarmed for having been intoxicated twenty-four years ago, or even for driving under the influence—a grave matter justifying a typically temporary loss of one's driver's license, not a lifetime loss of Second Amendment rights. Nor would such a consequence for DUI convictions be remotely constitutional. Nor is Suarez an alcoholic. Indeed, hard-core drug addicts fare better under Section 922(g)(3) than would Suarez under the rule implicitly suggested by the Government.

Undaunted by the lack of evidence of the sort required in as-applied Section 922(g)(1) challenges, the Government buries the record with generalized claims about recidivism. But the Third Circuit is well-aware of the concept of recidivism. It instructs, however, that the inquiry is whether *the plaintiff* is likely to recidivate, based on his unique factual circumstances. Not only has Suarez not committed a 922(g)(1) predicate for nearly a quarter century. Relief here would reduce Suarez's chance of re-offending to practically zero, at least in Pennsylvania, which does not require a license to carry handguns openly and which would license Suarez to carry handguns concealed.

Because this is not a facial challenge to the felon disarmament ban, the Government's argument proves too much. If generalized recidivism studies defeat

*all* as-applied challenges to Section 922(g)(1), then they overrule *Barton*, if not *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), which understands felon disarmament as a rebuttable presumption. The Government's recidivism arguments are best left, if at all, to the Third Circuit sitting en banc, or to the Supreme Court whose precedent *Barton* faithfully applies. However proper the felon-in-possession might *generally* be because felons recidivate—simply not an issue in this case—persisting in barring *Suarez*'s access to firearms on the basis of *his* long-ago non-violent misdemeanor conviction violates *his* Second Amendment rights.

And yet, the Court should hesitate to reach the constitutional issue, as grave doubt exists whether Section 922(g)(1) is applicable to Suarez's misdemeanor. This Court should consider what the Third Circuit has apparently yet not—that a consistent, careful reading of the plain statutory text excludes from the "felon" prohibition state misdemeanors lacking a mandatory minimum sentence exceeding two years. And if precedent bars this construction, such precedent's validity would be questionable, as it preceded the Second Amendment right's recognition.

The Government believes that Section 922(g)(1)'s prohibition, read in light of Section 921(a)(20)(B)'s exemption, extends to state misdemeanors punishable by sentences *exceeding* two years. Indeed, courts have apparently assumed as much without examination. Respectfully, this interpretation misreads the statutory text's

plain language. The *exemption* of Section 921(a)(20)(B) does not *include* crimes capable of being punished by more than 2 years; rather, it *excludes*, from Section 921(g)(1)'s reach of all crimes punishable by over one year in jail, misdemeanors that are punishable by terms of "less than two years"—at least, if the term "punishable" is given a consistent meaning in both sections. The rule of lenity, and the constitutional avoidance doctrine, compel close scrutiny of the relevant statutory text before proceeding to the serious constitutional problems presented by barring Suarez's exercise of his fundamental rights.

In either event, however, the outcome is the same. Suarez is entitled to relief barring Section 922(g)(1)'s application against him on account of his 1990 misdemeanor.

## ARGUMENT

## I.   SECTION 922(G)(1) DOES NOT BAR SUAREZ FROM POSSESSING FIREARMS.

"A court owes no deference to the prosecution's interpretation of a criminal law." *Whitman* v. *United States*, No. 14-29, __ U.S. __, 2014 U.S. LEXIS 7431, at *1 (Nov. 10, 2014) (Scalia, J., concerning denial of certiorari). "The Justice Department, of course, has a very specific responsibility to determine for itself what this statute means, in order to decide when to prosecute; but we have never thought that the interpretation of those charged with prosecuting criminal statutes is

entitled to deference." *Crandon* v. *United States*, 494 U.S. 152, 177 (1990)

(Scalia, J.,  concurring in the judgment); see *United States* v. *Apel*, 134 S. Ct.

1144, 1151 (2014) ("we have never held that the Government's reading of a

criminal statute is entitled to any deference") (citing *Crandon*); cf. *Util. Air*

*Regulatory Grp.* v. *EPA*, 134 S. Ct. 2427, 2446 (2014) ("an agency may not

rewrite clear statutory terms to suit its own sense of how the statute should

operate").

"The critical point is that criminal laws are for courts, not for the

Government, to construe." *Abramski* v. *United States*, 134 S. Ct. 2259, 2274

(2014). "Whether the Government interprets a criminal statute too broadly (as it

sometimes does) or too narrowly . . . a court has an obligation to correct its error. . .

. Congress [is] the entity whose voice *does* matter . . . ." *Id.*

A.    Ambiguous Criminal Statutes Are Afforded the Most Lenient
      Construction.

"[B]ecause of the seriousness of criminal penalties, and because criminal

punishment usually represents the moral condemnation of the community,

legislatures and not courts should define criminal activity." *United States* v. *Bass*,

404 U.S. 336, 348 (1971).

It is an ancient rule of statutory construction that penal statutes should be
strictly construed against the government . . . and in favor of the persons on

whom penalties are sought to be imposed . . . any reasonable doubt about the meaning is decided in favor of anyone subjected to a criminal statute.

Norman J. Singer, 3 SUTHERLAND ON STATUTORY CONSTRUCTION § 59:3, at 167-75 (7th ed. 2008) ("SUTHERLAND") (collecting cases); see also *id*. at 187-88 (discussing Supreme Court's adoption of the rule of lenity). Courts construe ambiguous criminal statutes narrowly to avoid "making criminal law in Congress's stead." *United States* v. *Santos*, 553 U.S. 507, 514 (2008).

In various ways over the years, we have stated that when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.

*Bass*, 404 U.S. at 347-48 (quotation omitted). "[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Jones* v. *United States*, 529 U.S. 848, 858 (2000) (quotation omitted).

B.   Section 922(g)(1) Does Not Apply to Misdemeanors Capable of Being Punished By Less Than Two Years' Imprisonment.

Courts generally refer to Section 922(g)(1) as the "felon in possession" statute, though the statute itself does not use that terminology. See*, e.g.*, *Davis* v. *United States*, 131 S. Ct. 2419, 2425-26 (2011) ("possession of a firearm by a convicted felon"); *Sykes* v. *United States*, 131 S. Ct. 2267, 2270 (2011). Section 921(g) apparently bars firearms possession by anyone convicted of "a crime punishable by imprisonment for a term exceeding one year," implicating all crimes

regardless of their classification as felonies or misdemeanors. But "the words of §

922(g)(1) do not always mean what they say." *Essig*, 10 F.3d at 971. "[C]rime

punishable by imprisonment for a term exceeding one year" "does not include . . .

(B) any State offense classified by the laws of the State as a misdemeanor and

punishable by a term of imprisonment of two years or less." Section 921(a)(20).

Suarez's crime was a misdemeanor for which a person might have received a

three year sentence of imprisonment. But Suarez could—and did—receive a

sentence "of two years or less." Section 921(a)(20)(B). Whether Suarez's

conviction qualifies for the two-year exclusion turns on the interpretation of

"punishable"—a term lending itself to multiple understandings.

"[T]he starting point for interpreting a statute is the language of the statute

itself." *Prestol Espinal* v. *AG of the United States*, 653 F.3d 213 (3d Cir. 2011)

(citation omitted). In general terms, "punishable" is defined as "deserving of, or

liable to, punishment : capable of being punished by law or right." WEBSTER'S

NEW INTERNATIONAL DICTIONARY 1843 (3d ed. 1961). But its meaning is also

subject to significant variations, depending on whether used in reference to a

person (*e.g.*, "a punishable offender") or an offense (*e.g.*, "a crime punishable by

death"). Black's Law Dictionary recognizes this distinction with separate entries

for each—the former meaning "subject to a punishment," but the latter defined as

14

"giving rise to a *specified* punishment." BLACK'S LAW DICTIONARY, 1353 (9th ed., 2009) (emphasis added).

The latter interpretation usually supplies the more punitive outcome. If "punishable by a term of imprisonment of two years or less" refers to specific terms, Suarez's offense does not qualify for Section 921(a)(20)(B)'s exclusion—as used in this sense, two years implies a maximum sentence, and Suarez's offense was punishable by a term of three years. But if "punishable" means "capable of being punished," then Suarez's offense comes within the meaning of the exclusion, because it was "capable of being punished by" a sentence "of two years or less," as demonstrated by Suarez's actual sentence. "Two years or less" is included within "five years or less," "ten years or less," and "lifetime or less." Under this view, state misdemeanors come within the "felon in possession" ban only if a mandatory minimum provision requires a sentence exceeding two years.

The latter approach enjoys the potential benefit of not adding words to Congress's statute. Section 921(a)(20)(B) does not provide, "punishable *only* by a term of imprisonment of two years or less," such that if a misdemeanor is *also* punishable by a term exceeding two years, it falls outside the exclusion. Rather, the text quite plainly provides that the scheme excludes misdemeanors "punishable by" two years or less. Period, full stop.

15

Courts cannot "engage in a statutory rewrite" by "insert[ing] the word 'only' here and there . . . ." *Adirondack Med. Ctr.* v. *Sebelius*, 740 F.3d 692, 699 (D.C. Cir. 2014); *Public Citizen, Inc.* v. *Rubber Mfrs. Ass'n*, 533 F.3d 810, 817 (D.C. Cir.2008) (footnote omitted) ("Congress knows well how to say that disclosures may be made *only* under specified provisions or circumstances, but it did not do so here"). "What the Government asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope. To supply omissions transcends the judicial function." *Iselin* v. *United States*, 270 U.S. 245, 251 (1926) (citations omitted). But "[w]ith a plain, nonabsurd meaning in view, we need not proceed in this way. There is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted." *Lamie* v. *United States Tr.*, 540 U.S. 526, 538 (2004) (quotation omitted).

A "nonabsurd meaning" is plainly "in view." Indeed, the law makes more sense as written than it would as the Government would rewrite it, reflecting the rather unremarkable concept, championed by the Government in other contexts, that serious crimes carry mandatory minimum sentences. If a misdemeanor can be punished by two years or less, there is no prohibition. If a misdemeanor *cannot* be

punished by two years or less, e.g., because it is extremely serious and warrants a higher mandatory minimum sentence, then "felon" treatment applies.

This outcome may not provide as harsh a result as the Government might prefer, but it is what Congress has prescribed. In any event, it is not the Court's role to take sides in a policy debate and override the statute's plain meaning simply because the Government asserts that society would benefit by criminalizing yet-more conduct. "The role of th[e] [c]ourt is to apply the statute as it is written—even if we think some other approach might 'accor[d] with good policy.'" *Burrage* v. *United States*, 134 S. Ct. 881, 892 (2014) (quoting *Comm'r* v. *Lundy*, 516 U.S. 235, 252 (1996)) (third alteration in original); see also *Lewis* v. *City of Chicago*, 560 U.S. 205, 217 (2010) ("[I]t is not our task to assess the consequences of each approach [to interpreting a statute] and adopt the one that produces the least mischief. Our charge is to give effect to the law Congress enacted."); *United States* v. *Locke*, 471 U.S. 84, 95 (1985) ("[T]he fact that Congress might have acted with greater clarity or foresight does not give courts a carte blanche to redraft statutes in an effort to achieve that which Congress is perceived to have failed to do").

While the rule of lenity should have compelled courts to take the "capable of being punished" approach, it does not appear that anyone has advanced the argument until very recently. A number of decisions have accepted the

Government's view, in dicta or in passing, and never in response to an actual contrary argument. Especially in light of the constitutional avoidance doctrine, infra, Suarez does not believe these decisions are controlling. But they do warrant frank acknowledgment, and review.

First among these stands *Logan* v. *United States*, 552 U.S. 23 (2007), where in dicta, the Supreme Court cited Section 921(a)(20)(B) for the proposition that "[a]n offense classified by a State as a misdemeanor . . . *may* qualify as a 'violent felony' for ACCA-enhancement purposes (or as a predicate for a felon-in-possession conviction under § 922(g)) only if the offense is punishable by more than two years in prison." *Logan*, 552 U.S. at 27 (emphasis added). But then, such an offense may *not* qualify if it is also punishable by *less* than two years' imprisonment. In any event, this was all dicta, because (unlike here) the matter was not contested. Logan should have tried harder, but instead, he "acknowledge[d]" that his earlier convictions "facially qualifie[d] as violent felonies under § 921(a)(20)(B) (2000 ed.)." *Logan*, 552 U.S. at 30 (citing Petitioners' Brief). "Thus the sole matter in dispute" was whether his rights had been sufficiently restored. *Id.* at 30-31.

Likewise, the Third Circuit readily accepted, without examination, that a misdemeanor's potential five year term places it within Section 922(g)(1)'s ambit.

18

"Any potential one year/two year conflict between § 922(g)(1) and §

921(a)(20)(B) has no adverse effect on Essig because his state conviction is

punishable by imprisonment for up to five years." *Essig*, 10 F.3d at 971. But

presciently foreshadowing future cases, the Third Circuit cautioned that the

conflict between the two sections could become relevant:

> Essig ignores the statute's peculiar equation of one year with two years
> when state crimes are involved, and so will we hereafter because it has no
> effect on this case. It is not logically relevant to any of the arguments made
> by Essig or on his behalf. It may not be possible, however, to ignore it in all
> cases.

*Id.* at 971 n.9. *Essig* considered (and rejected) only arguments not advanced here:

that the "sentence actually imposed" controls the term, *id.* at 973, and that

"retention of two of the three core civil rights to which § 921(a)(20) refers"

suffices for restoration, *id.* at 975.

Likewise, in dicta, the Third Circuit appears to have accepted the

Government's theory in *United States* v. *Schoolcraft*, 879 F.2d 64 (3d Cir. 1989).

But Mr. Schoolcraft did not make the argument presented here. Rather, he

challenged the sufficiency of the evidence against him showing that he had

committed a predicate offense under Section 922(g)(1), by erroneously claiming

that the Government was "required to show that he had been previously convicted

of a felony." *Schoolcraft*, 879 F.2d at 69. Of course, Section 922(g)(1) also applies

19

to misdemeanors, and in any event, Schoolcraft had been convicted of *felony*

robbery. *Id.* at 70. The Court noted in passing that the sentencing range for felony

robbery carried a maximum seven to twenty years, *id.*, but it did not engage in any

discussion of the meaning of "punishable by," which was in any event irrelevant

considering the felony classification of Schoolcraft's conviction.[2]

Indeed, the relevant Third Circuit precedent does not speak with one voice

on the subject of how the term "punishable" is defined. Section 922(g)(1)'s use of

the term "punishable" is given the broader meaning, referencing potentiality, when

the Court seeks to determine which crimes are *included* within the prohibition.

See, *e.g.*, *United States* v. *Leuschen*, 395 F.3d 155, 158 (3d Cir. 2005) ("the only

qualification imposed by § 922(g)(1) is that the predicate conviction carry a

*potential* sentence of greater than one year of imprisonment") (emphasis added);

*United States* v. *Corle*, 222 Fed. Appx. 121, 123 (3d Cir. 2007).

Alas, whatever "punishable" means, it must mean the same thing in Section

922(g)(1) that it means in Section 921(a)(20)(B). A "basic canon of statutory

---

[2]A curt, non-precedential case also adopted this view. *Dutton* v. *Pennsylvania*, No. 11-7285, 2012 U.S. Dist. LEXIS 102653 (E.D. Pa. July 23, 2012), *aff'd*, 503 Fed. Appx. 125 (3d Cir. 2012) (per curiam). But this was a *pro se* matter where the plaintiff did not even understand which law purportedly disabled him, claiming that his misdemeanor conviction failed to qualify under Section 922(g)(9) where in fact he was allegedly prohibited by Section 922(g)(1).

construction [holds] that identical terms within an Act bear the same meaning."

*Estate of Cowart* v. *Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992) (citations

omitted). Just as "differing language" in "two subsections" of a statute should not

be given "the same meaning," *Russello* v. *United States*, 464 U.S. 16, 23 (1983),

"[u]ndoubtedly, there is a natural presumption that identical words used in

different parts of the same act are intended to have the same meaning," *Atl.*

*Cleaners & Dyers, Inc.* v. *United States*, 286 U.S. 427, 433 (1932).

Of course, "[t]here is . . . no effectively irrebuttable presumption that the

same defined term in different provisions of the same statute must be interpreted

identically. Context counts." *Envtl. Def.* v. *Duke Energy Corp.*, 549 U.S. 561,

575-76 (2007) (quotation omitted). "[T]he presumption is not rigid, and the

meaning [of the same words] well may vary to meet the purposes of the law."

*United States* v. *Cleveland Indians Baseball Co.*, 532 U.S. 200, 213 (2001)

(quotations omitted). But "[w]here two statutes operate in the same area of the law

. . . the general rule remains that similar language should be interpreted similarly."

*Omega Overseas, Ltd.* v. *Griffith*, No. 13-CV-4202, 2014 U.S. Dist. LEXIS

109781, at *17-*18 (S.D.N.Y. Aug. 7, 2014) (citations omitted).

And here, the context of Sections 922(g)(1) and 921(a)(20)(B) is identical.

Both statutes work together to delineate crimes included—and excluded—from the

"felon" ban's scope. It is not enough for the Government to respond that "context matters"—that much is known. But it is known as an exception to the presumption that identical terms share an identical meaning. The Government bears the burden of showing why these two provisions exist in different contexts, and how those different contexts would inform completely different meanings of the term "punishable by." This much, the Government cannot do. See *Sorenson* v. *Sec'y of Treasury*, 475 U.S. 851, 860 (1986) ("that both subsections concern the tax-refund treatment of '[overpayments]' is especially damaging to any claim" of different contextual meanings).

It cannot be that "punishable" means "capable of being punished" when looking to include offenses in a criminal prohibition, but refers to specific terms of punishment when defining an exclusion from that same prohibition. And while either definition achieves the same effect if used in Section 922(g)(1), which speaks of a "term *exceeding* one year" (emphasis added), the different definitions yield different results when utilized in Section 921(a)(20)(B)'s context, referring to "a term of imprisonment of two years *or less*" (emphasis added).

At first glance, it would appear that this Court is bound by *Essig*'s utilization of the specific term approach that would read Section 36B(b) out of Section 921(a)(20)(B)'s exclusion. But the *Essig* court had the foresight to

22

acknowledge that the issue was complicated and subject to future litigation. Moreover, this Court is also bound by *Leuschen*, decided later, and confirming the potentiality-based definition of "punishable by" as used in Section 922(g)(1).

Respectfully, Suarez urges the Court to follow *Leuschen* in defining "punishable by" as referencing potential sentences. This approach finds precedential support, albeit problematic in its own way, in the context of Section 921(a)(20)(B)'s misdemeanor exclusion. A recent D.C. Circuit case, in which the Government successfully advanced the "capable of being punished" approach to Section 921(a)(20)(B) that Suarez here endorses, produced an internally contradictory but nonetheless instructive outcome. *Schrader* v. *Holder*, 704 F.3d 980 (D.C. Cir. 2012).

In 1968, Navy enlistee Jeff Schrader was convicted of common-law misdemeanor assault in Maryland, owing to a scuffle with a gang member who had previously assaulted him. Over forty years later, the Government disarmed Schrader under Section 922(g)(1), arguing that the common law's lack of statutory sentencing provisions meant that only the Eighth Amendment limited Schrader's potential sentence. Schrader sued, arguing *inter alia* that "punishable" refers to specific statutory terms, and thereby does not extend to common law crimes.

The D.C. Circuit disagreed. After reasoning that because *some* common-law misdemeanor offenses were serious, Congress could not have intended to exclude them from the "felon-in-possession" ban, the court held that "the common-sense meaning of the term 'punishable,' . . . refers to any punishment capable of being imposed, not necessarily a punishment specified by statute." *Schrader*, 704 F.3d at 986. Inexplicably, the court then held that "because [common law] offenses are also capable of being punished by *more than two years'* imprisonment, they are ineligible for section 921(a)(20)(B)'s misdemeanor exception." *Schrader*, 704 F.3d at 986 (emphasis added). The Fourth Circuit had previously held likewise. *United States* v. *Coleman*, 158 F.3d 199, 203 (4th Cir. 1998) (en banc).

Respectfully, the D.C. Circuit, like the Fourth Circuit before it, misread the statutory text. Where Congress wrote, "two years or less," 18 U.S.C. § 921(a)(20)(B), the court saw the words "more than two years." *Schrader*, 704 F.3d at 986. These are not the same thing. Under the "capable of being punished" approach adopted by the D.C. Circuit for Section 922(g)(1), *id.*, Schrader should have prevailed—a common-law offense is certainly "capable of being punished," *id.*, by "two years or less," Section 921(a)(20)(B), as demonstrated by Schrader's no-jail sentence.

24

In accordance with *Leuschen*, and the Government's successful arguments in *Schrader* and *Coleman*, this Court should hold that "punishable" as used in Section 921(a)(20)(B) means the same thing that it means in Section 922(g)(1): "capable of being punished." Suarez's crime, a state misdemeanor capable of being punished "by a term of imprisonment of two years of less," *id.*, falls outside the reach of Section 922(g)(1).

C.    Courts Must Avoid Constitutional Questions Where Alternative Statutory Interpretations Raising No Constitutional Concerns Are "Fairly Possible."

As shown below, applying the felon-in-possession ban against Suarez raises serious constitutional questions. This is reason alone to construe the ban narrowly in light of the two-year misdemeanor exemption. "[I]t is a well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case." *Bond* v. *United States*, 134 S. Ct. 2077, 2087 (2014) (quotation and citations omitted). "[W]hen a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *Harris* v. *United States*, 536 U.S. 545, 555 (2002) (quotation omitted).

"[T]he fact that one among alternative constructions would involve serious constitutional difficulties is reason to reject that interpretation in favor of another." 2A Sutherland § 45.11, at 87 (collecting cases); see *United States* v. *Rehlander*, 666 F.3d 45, 49 (1st Cir. 2012) ("statutes are to be read to avoid serious constitutional doubts").

Accordingly, "[t]he question is not whether" an alternative statutory interpretation "is the most natural interpretation of the [law], but only whether it is a 'fairly possible' one. As we have explained, 'every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'" *Nat'l Fed'n of Indep. Bus.* v. *Sebelius*, 132 S. Ct. 2566, 2594 (2012) (Roberts, C.J.) (quotations omitted); cf. *PDK Labs. Inc.* v. *United States DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment) ("if it is not necessary to decide more, it is necessary not to decide more").

> D.   Precedent Predating the Second Amendment Right's Recognition Cannot Support Constitutionally Now-Dubious Interpretations of the Felon-In-Possession Ban.

The constitutional avoidance doctrine also informs the courts' understanding of what constitutes precedent. Older precedent can be effectively undermined by new constitutional considerations. Thus, even if *Essig* controlled the question of whether Suarez's offense triggers Section 922(g)(1) prior to the Supreme Court's

recent revival of the Second Amendment, this Court should consider what effect these recent, significant decisions have on the vitality of *Essig*, which was decided without their benefit.

"[T]he district court is bound by the decision of the court of appeals *absent intervening Supreme Court precedent . . . .*" *Coca-Cola Bottling Co.* v. *Coca-Cola Co.*, 988 F.2d 386, 411 n.25 (3d Cir. 1993) (emphasis added). "A court need not blindly follow decisions that have been undercut by subsequent cases . . . ." *United States* v. *Burke*, 781 F.2d 1234, 1239 n.2 (7th Cir. 1985) (citations omitted). Indeed, a failure to recognize that intervening Supreme Court precedent rendered obsolete a circuit court decision has supplied grounds for summary reversal. *United States v. Nachtigal*, 507 U.S. 1 (1993).

Obsolescence can come not only by way of directly controlling new precedent, but also in (admittedly rare) cases where "authority that postdates the original decision, although not directly controlling, nevertheless offers a sound reason for believing that the former panel, in light of fresh developments, would change its collective mind." *United States* v. *Rodriguez*, 527 F.3d 221, 255 (1st Cir. 2008). The announcement of, effectively, a new constitutional right would predictably have this effect. When the Third Circuit decided *Essig*, and concluded without apparent examination that a corruption of minors misdemeanor conviction

27

triggers Section 921(g)(1), circuit precedent had held that the Second Amendment "was not adopted with individual rights in mind." *United States* v. *Tot*, 131 F.2d 261, 266 (3d Cir. 1942), *rev'd on other grounds*, 319 U.S. 463 (1943); see also *United States* v. *Rybar*, 103 F.3d 273, 286 (3d Cir. 1996). The *Essig* court would not have thought of construing Section 922(g)(1) in such manner as to avoid raising difficult Second Amendment questions. Since *Essig*, however, the Supreme Court has corrected the "collective right" error. *District of Columbia* v. *Heller*, supra, 554 U.S. 570.

Directly on-point stands *Rehlander*, supra, 666 F.3d 45, in which a First Circuit panel narrowed its prior construction of a federal firearm prohibition and adopted an alternative statutory construction so as to avoid questions under *Heller*. The Second Amendment "claim is sufficiently powerful that the doctrine of constitutional avoidance requires us to revisit our prior interpretation . . . ." *Id.* at 47. Likewise here, *Essig*'s implicit reading of the two-year misdemeanor exemption as defining a limitation rather than a possibility ("punishable by") sweeps into the "felon-in-possession" ban a wide array of non-violent misdemeanors, committed by people at very low risk of recidivism, who can be expected to present serious Second Amendment claims. The Government may be

28

comfortable with that outcome, but the Third Circuit is not. See *Barton*, supra, 633 F.3d 168 (setting out process for as-applied challenges to Section 922(g)(1)).

The constitutional avoidance doctrine counsels the other, quite fairly possible reading of Section 922(a)(20)(B). And circuit precedent can be no impediment in this regard.

* * *

Suarez acknowledges that the Eastern District rejected this statutory argument in *Binderup*. But *Binderup* did not so much hold that the Government's statutory interpretation is more compelling in any respect than that advanced here. Rather, the *Binderup* court seemed to believe that its statutory decision was compelled as a matter of precedent. See *Binderup*, 2014 U.S. Dist. LEXIS 135110, at *26 ("based upon the case law"); *id.* at *27 ("[g]iven the consistent interpretation and application of 'punishable by'); *id.* at *30 ("the case law . . . leaves no doubt"). The opinion is well-reasoned, if ultimately, erroneous with respect to the statutory issue, for the reasons discussed supra.

In any event, unlike the cases upon which *Binderup* relied, reviewed supra, the Eastern District was apparently the first court to squarely consider arguments regarding Section 921(a)(20)(B)'s actual text. This Court is the second. Respectfully, room remains for the law to develop an answer.

II.   THE SECOND AMENDMENT BARS SECTION 922(G)(1)'S APPLICATION
      AGAINST SUAREZ ON ACCOUNT OF HIS MISDEMEANOR.

Section 922(g)(1) is generally acknowledged to be constitutional on its face

as a presumptively-lawful measure. *Barton*, 633 F.3d at 172. Suarez does not

question that. However,

> the Government concede[d] [that] *Heller*'s statement regarding the
> presumptive validity of felon gun dispossession statutes does not foreclose
> [an] as-applied challenge. By describing the felon disarmament ban as
> 'presumptively' lawful, the Supreme Court implied that the presumption may
> be rebutted.

*Id.* at 173 (citing *Heller*, 554 U.S. at 626-27 n.26).

The Third Circuit is not alone in reaching this determination. Nearly all

federal courts to have considered the question agree, as did the Government in

*Barton*, that *Heller* recognizes as-applied Section 922(g)(1) challenges. "*Heller*

referred to felon disarmament bans only as 'presumptively lawful,' which, by

implication, means that there must exist the possibility that the ban could be

unconstitutional in the face of an as-applied challenge." *United States* v. *Williams*,

616 F.3d 685, 692 (7th Cir. 2010); *United States* v. *Moore*, 666 F.3d 313, 319

(4th Cir. 2012); *United States* v. *Chester*, 628 F.3d 673, 679 (4th Cir. 2010);

*Schrader*, 704 F.3d at 991.

The courts' conclusion that individuals may bring as-applied challenges to

Section 922(g)(1) is reinforced when considering that Section 922(g)(1)'s

presumptive validity depends on the theory that it reflects longstanding regulatory

conduct. Thus, it is highly relevant that the same Congress that enacted Section

922(g)(1) also enacted Section 925(c), providing for as-applied relief. Under this

provision, prohibited individuals might petition for relief upon showing that

> the circumstances regarding the disability, and the applicant's record and
> reputation, are such that the applicant will not be likely to act in a manner
> dangerous to public safety and that the granting of the relief would not be
> contrary to the public interest.

18 U.S.C. § 925(c). Federal district courts can review the denial of relief under

this provision. *Id.* Alas, Congress has barred Defendants from expending any funds

to process such claims for relief. See, *e.g.*, *Schrader*, 704 F.3d at 982-83. In

*Heller*'s wake, consistent with *Barton* and similar opinions, every claim for relief

that would otherwise be presented administratively in the first instance under

Section 925(c) is now a federal case. This appears to be an inefficient use of funds,

but it is what Congress has effectively decreed.

 But *how* should courts go about evaluating as-applied challenges to Section

922(g)(1)? Contrary to the Government's argument here—and as it conceded in

the Eastern District only months ago—Suarez's constitutional challenge begins, is

controlled by, and ends, with *Barton.* This Court must follow *Barton*, and decide

that claim (should it be reached) by examining each *Barton* element of Suarez's

*Barton* challenge. Means-ends scrutiny (strict, as this is a misdemeanor case)

would be fine for a facial challenge, but it plays no role in a *Barton*, as-applied

challenge.

The issue is not whether the law, as a general matter, is constitutional. It is.

The issue is whether the law, if it applies at all, is constitutional as applied to

Suarez.

A.   The Two-Step Framework for Analyzing Facial Second Amendment
     Challenges   is Inapplicable to Suarez's As-Applied *Barton* Challenge.

Defendants attempt to frame this case in terms of the two-step analytical

approach adopted in *United States* v. *Marzzarella*, 614 F.3d 85 (3d Cir. 2010),

under which courts first determine whether the challenged law implicates the

Second Amendment, and if so, whether it passes means-ends scrutiny under some

heightened standard of review.

This is the wrong test. While *Marzzarella*'s two-step test would be fine in

some facial challenges, where a law's generalized constitutional merit is at issue

and no other method is proper,[3] it has very little to do with an *as applied* challenge,

---

[3]*Marzzarella*'s two-step approach is not universally applicable even to all facial challenges. Some laws fail simply because they are not compatible with the constitutional right. In *Heller*, for example, the Supreme Court struck down Washington, D.C.'s handgun ban because the Second Amendment guarantees a right to possess handguns, and it struck down that city's functional firearms ban because self-defense is the Second Amendment's core purpose. Like the D.C. Circuit that it affirmed, the Supreme Court did *not* employ any two-step, means-ends analysis.

which begins with the assumptions that the law implicates the Second Amendment
(obviating the need for step one) and is generally constitutional (resolving step
two). For these types of cases, the Third Circuit has a very different test:

> To raise a successful as-applied challenge, [an individual] must present facts
> about himself and his background that distinguish his circumstances from
> those of persons historically barred from Second Amendment protections.
> For instance, a felon convicted of a minor, non-violent crime might show
> that he is no more dangerous than a typical law-abiding citizen. Similarly, a
> court might find that a felon whose crime of conviction is decades-old poses
> no continuing threat to society.

*Barton*, 633 F.3d at 174.

Of course, Defendants would like to address this case at a high level of
generality, because crime is generally bad and criminals are generally undeserving
of relief. But this case does not concern the Government's generalized interest in
disarming criminals; it concerns the governmental interest, if any, in disarming *Mr.
Suarez*—and in *his* particular circumstances.[4] The Government's ten page
argument for Section 922(g)(1) under means-ends scrutiny is irrelevant. Adding

---

[4] Some courts have applied means-ends scrutiny in the context of an as-applied challenge to Section 922(g)(1). See, *e.g.*, *United States* v. *Williams*, 616 F.3d 685, 692 (7th Cir. 2010). But the Third Circuit took a different approach in *Barton*, and *Barton* controls here. Even were this a matter of means-ends scrutiny, the *Barton* factors would be dispositive on the question of why or how the Government's disarmament of Suarez substantially advances its interests.

the words "as applied" to its conclusion does not thereby convert it into a response to an as-applied claim.

Ironically, considering its resistance to *Barton*, the Government may actually benefit in some way from that analysis. Noting that means-ends scrutiny places the burden of persuasion on the Government, while as-applied challenges place that burden on plaintiffs, the Eastern District "conclude[d] that *Barton*—the more recent, and directly-on-point precedential Opinion of the Third Circuit—provides the framework governing" as-applied challenges under Section 922(g)(1). *Binderup*, 2014 U.S. Dist. LEXIS 135110, at *57. But it is not even clear, at least in this case, that the burden would fall on Suarez.

> While the Supreme Court has historically allowed prohibitions as to certain individuals, including felons and those convicted of violent crimes, at the time the Second Amendment was passed and at the time the Fourteenth Amendment was ratified, it was not intended to apply to non-violent misdemeanants, nor has this group of individuals traditionally been barred from exercising their inherent Second Amendment rights.

*Gowder*, 923 F. Supp. 2d at 1122. Indeed, the Supreme Court did not define the "law-abiding, responsible citizens" who enjoy Second Amendment rights, *Heller*, 554 U.S. at 635, as people lacking criminal convictions, or even people who have not been convicted of "a crime punishable by imprisonment for a term exceeding one year," the language of Section 922(g)(1). Rather, the Supreme Court contrasted "law-abiding, responsible citizens" with "*felons* and the mentally ill."

*Heller*, 554 U.S. at 626 (emphasis added); see *United States* v. *Chovan*, 735 F.3d 1127, 1148 (9th Cir. 2013) (Bea, J., concurring). And Section 922(g)(1) does not use the word "felons."

Misdemeanants are not considered "felons." The Third Circuit observed as much, noting the firearm prohibition leveled at domestic violence misdemeanants, though upheld as constitutional, "was not included in *Heller*'s list of permissible regulations." *Barton*, 633 F.3d at 172 n.2 (citations omitted); see also *Chovan*, 735 F.3d at 1137; *Chester*, 628 F.3d at 681-82 (misdemeanants not presumptively excluded from Second Amendment rights under *Heller*). Indeed, "*Heller*'s language warns readers not to treat *Heller* as containing broader holdings than the Court set out to establish." *Drake* v. *Filko*, 724 F.3d 426, 431 (3d Cir. 2013).

In any event, for all of its two-step *Marzzarella* arguments, the Government has helpfully conceded that *Barton* likely controls:

> I inquired of defendants' counsel whether or not [his] order of argument reflected defendants' prediction that the Third Circuit would likely find *Barton* to be the governing framework appropriately applicable to plaintiff's claim in Count Two. Counsel responded, candidly, that defendants are not certain, think that *Barton* speaks more directly to as-applied challenges, and briefed the issue under both frameworks in an abundance of caution.

*Id.* at *35 (footnote omitted); see Exh. H (relevant transcript excerpts).

*Barton* provides the roadmap for evaluating as-applied challenges to Section 922(g)(1)'s application, and guides the outcome of this case. While Mr. Barton's as-applied challenge failed, both *Barton* factors are present here, as they were in *Binderup*.

> B.    "Traditional Justifications" Do Not Support "A Finding of Permanent Disability in This Case."

> *Heller* does not catalogue the facts we must consider when reviewing a felon's as-applied challenge . . . to evaluate Barton's as-applied challenge, we look to the historical pedigree of 18 U.S.C. § 922(g) to determine whether the traditional justifications underlying the statute support a finding of permanent disability in this case.

*Barton*, 633 F.3d at 173. As the Third Circuit recounted, historically, only dangerous people were disarmed, Congress not extending firearms disabilities to non-violent offenders until 1961. *Id.* at 173-74. "For nearly a quarter century, § 922(g)(1) had a narrower basis for a disability, limited to those convicted of a 'crime of violence.' 'Crimes of violence' were commonly understood to include only those offenses ordinarily committed with the aid of firearms." *Id.* at 174 (quoting Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J. L. & PUB. POL'Y 695, 698 & 702 (2009)) (internal quotation marks omitted).

Defendants' resort to legislative history is unhelpful. This is, again, an *as-applied* challenge. Whatever Congress believed about the Act, the Third Circuit

allows as-applied challenges. In any event, the Gun Control Act's legislative history is fairly sparse. The law was "added by way of a floor amendment . . . and thus was not a subject of discussion in the legislative reports." *Lewis* v. *United States*, 445 U.S. 55, 62 (1980); see also *United States* v. *Batchelder*, 442 U.S. 114, 120 (1979); *Scarborough* v. *United States*, 431 U.S. 563, 569-70 (1977); *Bass*, 404 U.S. at 344 & n.11. However, "[w]hat little legislative history there is that is relevant reflects an intent to impose a firearms disability on any *felon* based on the fact of conviction." *Lewis*, 445 U.S. at 62 (emphasis added). Senator Long, who introduced and directed the passage of the Act, explained:

> So, under Title VII, every citizen could possess a gun until the commission of his first felony. Upon his conviction, however, Title VII would deny every assassin, murderer, thief and burglar of the right to possess a firearm in the future except where he has been pardoned by the President or a State Governor and had been expressly authorized by his pardon to possess a firearm.

114 Cong. Rec. 14773 (1968); see also *Lewis*, 445 U.S. at 62-63 ("Inasmuch as Senator Long was the sponsor and floor manager of the bill, his statements are entitled to weight.") (citation omitted).

The Government dryly states that "'[P]ersons with records of misdemeanor arrests' were among those whose access to firearms concerned Congress." Def. Br., at 11-12 (quoting S. Rep. No. 88-1340, at 4 (1964)). But going behind that description to the actual report is illuminating. Congress was "concerned" only

37

with an elevated group of misdemeanants with "undesirable character" and extensive records of arrests spanning several years:

> As our investigation progressed, it became apparent that a major source of firearms to juveniles and young adults was the mail-order common carrier route. * * * It was further determined during the investigation that not only juveniles were availing themselves of this source of firearms, but also young adult and adult felons, narcotic addicts, mental defectives, and others of generally undesirable character. The term 'undesirable' as used in this report refers to *persons with records of misdemeanor arrests of a period of several years.*

S. Rep. No. 88-1340 (1964), at 4 (emphasis added). These concerns do not speak to Plaintiff.

Plainly, Suarez's offense—carrying a gun without a license—is not violent, nor does it involve any inherently threatening conduct. It was not the carrying of a gun that Maryland's law condemned, but doing so without a license. "Carrying a gun, which is a Second Amendment right . . . cannot legally lead to a finding that the individual is likely to murder someone; if it could, half or even more of the people in some of our states would qualify as likely murderers." *Dickens* v. *Ryan*, 688 F.3d 1054, 1085 (9th Cir. 2012) (Reinhardt, J., dissenting).

Indeed, Pennsylvania stands among those states that allows individuals to carry handguns openly without a license. Maryland's law does not distinguish between the open or concealed carrying of handguns. While the manner in which Suarez carried his handgun was irrelevant to his case, many incidents of

38

unlicensed handgun carrying in Maryland would not be  crimes in this state. And

up to 8.3% of Pennsylvania's population over age 20 is licensed to carry handguns

concealed.[5]

Of course, Suarez does not claim that there is a right to carry a handgun

without a license. But the Government's claim that Suarez's conduct was so

egregious that it warrants a permanent forfeiture of fundamental rights, regardless

of how he has conducted his life in the ensuing quarter-century, must be evaluated

in light of the fact that the activity for which Maryland convicted Suarez of

conducting without benefit of a license is itself a constitutional right. Regrettably,

the Third Circuit stands alone among the circuits that have considered the matter in

denying that the carrying of handguns is a Second Amendment right; the Second,

Fourth, Fifth, Seventh and Ninth Circuits have all held or assumed that it is.

Compare *Drake*, supra, 724 F.3d 426, with *Peruta* v. *County of San Diego*, 742

F.3d 1144 (9th Cir. 2014); *Nat'l Rifle Ass'n of Am., Inc.* v. *McCraw*, 719 F.3d 338

(5th Cir. 2013) (upholding restrictions on right to carry by adults under age 21

after apparently assuming right exists); *Woollard* v. *Gallagher*, 712 F.3d 865, 876

---

[5]See U.S. Gen. Accounting Office, *States' Laws and Requirements for Concealed Carry Permits Vary Across Nation* 76 (2012), available at http://www.gao.gov/assets/600/592552.pdf (last visited November 11, 2014).

(4th Cir. 2013); *Moore* v. *Madigan*, 702 F.3d 933 (7th Cir. 2012); *Kachalsky* v.

*Cnty. of Westchester*, 701 F.3d 81, 93 (2d. Cir. 2012); see also *id.* at 89 & n.10.

Perhaps more critically, *Drake* directly contradicts the Supreme Court's

instruction that "[t]he natural meaning of 'bear arms'" is to "wear, bear, or carry . .

. upon the person or in the clothing or in a pocket, for the purpose . . . of being

armed and ready for offensive or defensive action in a case of conflict with another

person." *Heller*, 554 U.S. at 584 (quotation omitted). But even *Drake*

"recognize[d] that the Second Amendment's individual right to bear arms *may*

have some application beyond the home." *Drake*, 724 F.3d at 431.

In any event, while *some* non-violent offenses might justify a firearms

disability, violence remains the touchstone element in these cases. For example, as

the Third Circuit explained, "[c]ourts have held in a number of contexts that

offenses relating to drug trafficking and receiving stolen weapons are closely

related to violent crime," and those offenses thus support a firearms prohibition.

*Barton*, 633 F.3d at 174 (citations omitted). Tradition supports disarmament in

such cases:

> Debates from the Pennsylvania, Massachusetts and New Hampshire ratifying
> conventions, which were considered "highly influential" by the Supreme
> Court in *Heller*, 554 U.S. at 604, also confirm that the common law right to
> keep and bear arms did not extend to those who were likely to commit
> violent offenses.

*Id.* at 173.[6]

The Government's position, in contrast, is unhinged from any concerns with violence, offering that "[c]onvicted offenders as a group— including those convicted of crimes that did not involve violence—present a significant risk of recidivism for violent crime." Def. Br., at 13 (citation omitted). The cited source singles out for reproach not people committing violent offenses, but "property offenders." *Id.* (citation omitted). If shoplifters and bicycle thieves cannot obtain as-applied relief because they are likely to recidivate, *Barton* is a dead letter.

But violence matters. And carrying a handgun without a license, without more, does not incite violence. And no evidence suggests that historically, people convicted of unlicensed handgun carrying were disarmed. Suarez's crime, like all crimes, involved bad judgment—it did not involve force, or the threat of force, or coercion of any kind. Nothing about it suggests that Suarez's possession of firearms threatens society to a degree calling for permanent, total disarmament.

Indeed, one federal court has squarely rejected the notion that a misdemeanor conviction for unlawful handgun carrying warrants a firearms

---

[6]As the Third Circuit noted, even the gun rights of drug traffickers may be restored, citing favorably an opinion by North Carolina's Supreme Court reaching just that result. *Barton*, 633 F.3d at 174 (citing *Britt* v. *State*, 363 N.C. 546, 681 S.E.2d 320 (N.C. 2009)).

disability. Shawn Gowder was convicted of misdemeanor "unlawful use of a weapon," *Gowder*, 923 F. Supp. 2d at 1113—carrying or possessing a handgun "on or about his person, upon any public street, alley, or other public lands within" an urban area. See 720 ILCS 5/24-1(a)(10) (1994). Chicago subsequently denied Gowder a a firearm possession permit under an ordinance disarming anyone convicted of "an unlawful use of a weapon that is a firearm." Chi. Mun. Code § 8-20-110(b)(3)(iii) (2010). The Northern District of Illinois struck down the ordinance as vague, but also under the Second Amendment pursuant to a "text, history and tradition" analysis, strict scrutiny, and intermediate scrutiny.

An "unlawful use" predicate "does not necessarily implicate any violent or dangerous act, since a person can be convicted in certain jurisdictions of the offense of 'unlawful use of a weapon' for merely possessing a firearm without any violence associated with it." *Id.* at 1122.

> Gowder was convicted of a misdemeanor crime that involved no violence or direct threat to the safety of the public. A non-violent misdemeanant, such as Gowder, stands apart from the risky or violent misdemeanants, like [a domestic violence misdemeanants and a daily drug user], in that there is not evidence in this case showing that Gowder falls into the category of a risky person or embodies the type of violent citizen falling outside the group of individuals entitled to exercise their constitutional right to bear arms under the Second Amendment. The element of violence is a distinguishing factor between a domestic violence misdemeanor offense and a misdemeanor offense for merely possessing a weapon.

*Id.*

42

In contrast, the Government appears to rest its claim that *Barton* relief is unavailable to people convicted of unlicensed handgun carrying on *Dutton*, supra, a non-precedential case "that appears to have value only to the trial court or the parties." Third Cir. Internal Op. P. 5.3. The syllogism is: Suarez, like Dutton, was convicted of unlicensed carrying, and because Dutton obtained no relief, neither does Suarez.

The argument is specious. *Dutton* is not precedential for a reason—it was a *pro se* case brought by an individual "who has presented no facts distinguishing his circumstances from those of other felons." *Dutton*, 503 Fed. Appx. at 127 n.1. The Government makes much of the fact that *Dutton* was denied leave to amend his complaint, and from this, gleans that the Third Circuit was closed to the idea that as-applied challenges are available to people convicted of unlicensed carrying misdemeanors. But the Government does not properly read *Dutton*. As discussed supra, the *pro se* Dutton did not challenge Section 922(g)(1), arguing only that Section 922(g)(9) was inapplicable.

> This statement by the Third Circuit affirming the denial of leave to amend clearly indicates that no amendment would save the claim which Judge Schiller and the Third Circuit took Mr. Dutton to actually be asserting — namely, Mr. Dutton's statutory claim . . . . However, to read that footnoted statement by the Third Circuit in *Dutton II* to mean that there is no conceivable set of facts which Mr. Dutton could muster that would sufficiently state an as-applied challenge to § 922(g)(1) would effectively overrule the precedential Opinion in *Barton*.

43

*Binderup*, 2014 U.S. Dist. LEXIS 135110 at * 53-*54. Of course, Suarez, unlike

Dutton, *has* challenged Section 922(g)(1)'s application, and also unlike Dutton,

presented critical facts distinguishing his circumstances from those of other

"felons."

Perhaps sensing that neither a licensing violation nor the mere carrying of a

handgun presents a traditional basis for permanent firearm disability, the

Government adds alcohol to the mix. Suarez was driving under the influence, a

serious offense, and everyone would agree that firearms should not be handled

under the influence of alcohol.

But Suarez was not disarmed for drinking, for driving under the influence,

or even for having a gun in the car while drinking. He was disarmed, forever, for

having a gun without a license. That is the disability at issue. And while Suarez

does not condone even episodic incidents of maintaining a .11 BAC, it would be

extreme indeed, and well outside American tradition, to impose permanent

disarmament for two DUIs in a 24-year span, let alone one.[7]

---

[7]Just as Suarez does not make light of the severity of DUI offenses,
respectfully, neither should the Government overdramatize his incident. The
Government's statement that "in 2010, 65% of all people who died in
alcohol-impaired-driving crashes were drivers with a BAC of .08 percent or
higher," Def. Br. at 29 (citing Exh. 13), introducing Suarez's .11 BAC, suggests
that his BAC was unusually dangerous as far as DUI offenses go. But the
percentages in the Government's cited paragraph add up to 100%. They categorize

Indeed, the Government's "alcohol" argument is extreme in light of the Gun

Control Act. Congress is well-aware of alcohol's challenges, but despite (or

perhaps because of) that knowledge, Section 922(g)(3) imposes a disability only

for the abuse of controlled substances. Moreover,

> Congress chose to criminalize firearm possession by any person "who *is* an
> unlawful user[.]" [Section 922(g)(3)] (emphasis added). The use of the
> present tense was not idle. Quite simply, Congress intended the statute to
> cover unlawful drug use at or about the time of the possession of the firearm,
> with that drug use not remote in time or an isolated occurrence.

*United States* v. *Augustin*, 376 F.3d 135, 138 (3d Cir. 2004) (footnote omitted).

"[O]ne must be an unlawful user at or about the time he or she possessed the

firearm and . . . to be an unlawful user, one needed to have engaged in regular use

over a period of time proximate to or contemporaneous with the possession of the

firearm." *Id.* at 139; cf. *United States* v. *Yancey*, 621 F.3d 681, 686 (7th Cir. 2010)

(per curiam) ("unlike those who have been convicted of a felony or committed to a

mental institution and so face a lifetime ban, an unlawful drug user . . .  could

regain his right to possess a firearm simply by ending his drug abuse "); *United*

---

not drivers by BAC, but people by description of their role in the accident (drivers,
passengers, other occupants, non-occupants). The very same page *also* relates that a
BAC of .15, 36% higher than Suarez's, was associated with 70% of fatalities, with
a BAC of .18 being most frequently recorded in fatalities. Suarez should not have
been drinking and driving, period. But if the Government's point is that there are
degrees of inebriation, their study does not exactly prove Suarez's case to be
unusually egregious.

*States* v. *Duggan*, 657 F.3d 998, 999 (9th. Cir. 2011) (same). Had Suarez spent

the entire decade of the 1990s high on drugs but lived clean throughout the new

millennium, federal law would not impede his access to guns.

    C.    Suarez Has Presented Sufficient "Facts About Himself"
            Demonstrating Rehabilitation.

    Suarez's nearly quarter-century of continuing peaceful conduct confirms his

possession of firearms would pose no threat today. He has no other criminal

convictions aside from a 1998 DUI that followed a major life milestone, he has

sustained a healthy and stable family environment, maintains a leadership position

in his church, and is a productive member of society. He acknowledges mistakes

with alcohol, but those are in his distant past. Suarez has never been an alcoholic,

and alcohol does not adversely impact his life. Surely, Suarez's service to our

nation—a squad leader, non-commissioned officer in a Special Forces Group who

earned the Army Commendation Medal and Army Achievement Medal—raises

him above the status of permanently irresponsible common criminals, as do his

education, employment history, and security clearance.

    And even if there existed useful, *relevant* data regarding the recidivism rate

for Suarez's offense (Defendants' data does not measure up, see infra), the *Barton*

inquiry is personal—and here, satisfied. Whatever other convicted individuals

might do, Suarez has had zero disqualifying offenses since 1990, and only one

subsequent offense, not linked to gun violence, sixteen years ago. Moreover, in our

legal system, primary concern with an individual's threat to the public peace is

entrusted to state authorities—and the relevant authorities have determined that

Suarez should have his gun rights restored. See Exh. D. And it is difficult to see

how Suarez could recidivate—re-offend for unlicensed handgun

carrying—considering that he would not be required to obtain a license to carry a

handgun openly, and would be eligible to obtain a license to carry handguns

concealed.

        The failed as-applied challenges cited by the Government only prove

Suarez's case, by providing useful contrasts. Barton was caught selling a firearm

with an obliterated serial number, having been previously convicted of receiving a

stolen firearm and possessing cocaine with intent to distribute. *Barton*, 633 F.3d at

170. He "fail[ed] to develop the factual basis for his as-applied challenge," and

"[did] not argue that his predicate offenses make him no more likely than the

typical citizen to commit a crime of violence, nor could he have done so

persuasively in light of the facts of his case." *Id.* at 174. His illicit gun sale

"indicate[d] that Barton has not been rehabilitated." *Id.*

        Oppedisano had not only a felony DUI conviction, but had also pled guilty to

felony first degree reckless endangerment, and was asserting his Second

47

Amendment rights while charged with cocaine possession. *United States* v. *Oppedisano*, No. 09-CR-0305, 2010 U.S. Dist. LEXIS 127094, at *1, *6-*7 (E.D.N.Y. Nov. 30, 2010). Jones had been convicted of possession with intent to distribute cocaine, and first degree reckless injury while armed. *United States* v. *Jones*, 673 F. Supp. 2d 1347, 1349 n.1 (N.D. Ga. 2009). And "[w]hile [Jones] frame[d]s his argument as an as-applied challenge, it appear[ed] in fact to be a facial challenge to the statute: Defendant [made] no clear argument that there are facts that distinguish him from other felons such that the statute might be constitutionally applied to them but not to him." *Id.* at 1351. Indeed, Jones's arguments went no further than that his convictions were old, and that he did not unlawfully use the gun. *Id.* at 1352. The Court "attempt[ed] to address" the argument though it was "unclear." *Id.* at 1351.

Quite unlike these cases, Suarez is not currently under indictment for a serious felony, his transgressions are all in the distant past and are not of a nature indicating propensity to violence—and, critically, Suarez *has* presented evidence about himself that distinguishes him from ordinary criminals. The Government's proclamation that Suarez has no evidence about himself, coming as it does before Suarez's summary judgment was even filed, was at best premature. But the Government cannot refute the essential facts of Suarez's evidence—his military

record, his security clearance, his family life, church leadership, and decades of peaceful conduct.

What the Government has is studies—many studies, relating generalized facts about other people who are nothing like Suarez. Again, this would be fine evidence to defeat a facial challenge to Section 922(g)(1), but it has no relevance here. For example, Defendants' Exhibit 5 purports to show that individuals who were denied the ability to purchase handguns on account of a past criminal conviction later committed less crime than individuals who were allowed to purchase a handgun. But the latter group consisted of criminals, too. In fact, as the study concedes, "[t]his modest benefit may reflect the fact that members of both study groups had extensive prior criminal records and therefore were at high risk for later criminal activity." Exh. 5, at 2; *Binderup*, 2014 U.S. Dist. LEXIS 135110, at *84. Indeed,

> the 2470 members of the purchaser cohort had accumulated 14 192 arrest charges (mean: 5.7 ± 6.2; range: 1-90) and 6227 misdemeanor convictions (mean: 2.5 ± 3.2; range: 1-33). One third of charges were felonies; 21% of charges and 16% of convictions involved a weapon or violence.

Def. Exh. 5, at 1. How many of these were convicted only of one count of misdemeanor unlicensed handgun carrying is unknown. "Finally, and perhaps most significantly, the authors of the study stated that '[i]n terms of some potentially important differences in risk for later criminal activity, *this study was too small to*

49

*determine whether the differences occurred by chance.*'" *Binderup*, 2014 U.S.

Dist. LEXIS 135110, at *85 (quoting Def. Exh. 5 study) (emphasis in original).

The Government makes much of another study, Def. Exh. 6, showing that

handgun purchasers with prior non-violent misdemeanor convictions, generally,

were more likely to commit violence than were people with no criminal records.

But the universe of "non-violent firearm misdemeanor offenses" is a broad one. A

drug dealer trafficking in stolen guns, or carrying a gun in defense of a street

corner, is worlds apart from an ordinary citizen who carries a handgun, albeit

unlicensed, for self-defense against that same drug-dealer. Cf. *Gowder*, 923 F.

Supp. 2d at 1123-24 ("There is something incongruent about a non-violent person,

who is not a felon, but who is convicted of a misdemeanor offense of simple

possession of a firearm, being forever barred from exercising his constitutional

right to defend himself in his own home in Chicago against felons or violent

criminals.").

Defendants' Exhibit 9 is the same recidivism report described in *Barton*,

633 F.3d at 175. But as invoked here, this is a case study in selection bias. The

report tracks, as its title plainly states, "Prisoners Released." But Suarez was never

imprisoned. "A great leap is not required to distinguish plaintiff Binderup, whose

state-law offense earned him a probationary sentence, from individuals who

committed federal offenses which earned them a term of incarceration." *Binderup*,

2014 U.S. Dist. LEXIS 135110, at \*74-\*75. Individuals released from prison are

plainly more likely to be dangerous than people, like Suarez, who were *not* sent to

prison. This is both because prison inmates might acquire new criminal skills and

inclination while in prison, and because judges and prosecutors work hard to

ensure that prison resources are not wasted on non-dangerous offenders.

Defendants Exhibits 10 through 12, all of which track the outcomes for released

prisoners, are likewise inapposite.

Defendants nonetheless endorse a study that concluded that "[t]he

recidivism rates of offenders who had served prison sentences for weapon charges

were only slightly higher than the rates for offenders who had been arrested or

convicted on weapons charges but had avoided prison for these offenses." Def. Br.

at 15 (citing Exh. 7 at 2). As presented, this is very misleading. The offenders who

"had avoided prison for [weapons] offenses" did not avoid prison altogether.

*Everyone in the study had been released from prison*. See Def. Exh. 7 at 1 ("This

study is based on analysis of the complete, adult criminal histories of 16,241

sentenced offenders who were released of discharged from a state prison in 2005")

(footnote omitted). Suarez was not sent to prison, for any reason.

Finally, the Government offers an Iowa study that tracked the recidivism rates of people receiving probation, claiming that "53.1% of individuals who received only probation for weapons offenses were re-arrested, 15.6% for a violent offense," Def. Br. at 15 (citing Def. Exh. 8 at 27), and that "37.5% of probationers for weapons offenses were re-convicted, 12.5% for a crime of violence," *id.* (citing Def. Exh. 8 at 28). But the same study confirmed that "[g]enerally, the risk of recidivism was highest during the first year after admission to probation." Def. Exh. 8 at 1. "As released prisoners and probationers age, they tend to exhibit lower rates of recidivism." *Id.* at 2. Suarez is 51 years old today. Were he released to probation now, the study would predict he poses a 4.3% chance of being arrested for (not convicted of) a violent crime, *id.* at 39, table 38, and a 0% chance of being arrested for a violent felony, *id.* at 40, table 39. Of course, Suarez completed his probation decades ago, and has never been arrested for any violent crime.

In the end, this case is not about Mr. Barton, or Mr. Oppedisano, or Mr. Jones. Nor does it concern the various serious felons and inmates who provide so much fodder for criminological studies. The inquiry concerns Julio Suarez. "[H]e is no more dangerous than a typical law-abiding citizen," and "poses no continuing threat to society." *Barton*, 633 F.3d at 174.

CONCLUSION

Respectfully, the Government's motion should be denied. Julio Suarez's

motion for summary judgment should be granted.

Dated: November 13, 2014  Respectfully submitted,

By: /s/ Alan Gura_____  By: /s/ Douglas Gould_____
  Alan Gura*       Douglas Gould (PA Bar No. 78357)
  Gura & Possessky, PLLC   Law Offices of Douglas T. Gould, P.C.
  105 Oronoco Street, Suite 305  925 Glenbrook Avenue
  Alexandria, VA 22314    Bryn Mawr, PA 19010
  703.835.9085/Fax 703.997.7665 610.520.6181/Fax 610.520.6182
  alan@gurapossessky.com   dgould@gouldlawpa.com
  *Admitted pro hac vice    Attorneys for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that on this 13ᵗʰ day of November, 2014, I caused the foregoing to be served via electronic case filing, as follows:


DANIEL RIESS
Trial Attorney
U.S. Department of Justice
Civil Division, Rm. 6122
20 Massachusetts Avenue, NW
Washington, D.C. 20530
Telephone: (202) 353-3098
Fax: (202) 616-8460
Email: Daniel.Riess@usdoj.gov


/s/ Alan Gura
Alan Gura

CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with the Court's order of October 29, 2014, as the body of the brief (excluding the tables of contents and authorities) contains 12,108 words as counted by the WordPerfect X4 program on which it was prepared.


/s/ Alan Gura_____
Alan Gura

Counsel for Plaintiff